STEPHENS, Judge.
 

 *268
 
 Petitioner North Carolina Department of Public Safety ("DPS") appeals from the trial court's order affirming the Final Decision of the Office of Administrative Hearings ("OAH") by Senior Administrative Law Judge ("ALJ") Fred G. Morrison, Jr., in favor of Respondent Chauncey John Ledford on his claim for political affiliation discrimination. DPS argues that ALJ Morrison erred in concluding that Ledford satisfied his
 
 prima facie
 
 burden and proved by a preponderance of the evidence that the purportedly legitimate nondiscriminatory reasons DPS articulated for terminating him were merely pretextual. We affirm.
 

 *53
 

 Factual Background
 

 Ledford was born on 8 July 1965 and grew up in Madison County, where his father, a registered Democrat, served as a member of the Board of Commissioners for 20 years. In 1990, Ledford began a career in law enforcement as a Buncombe County Deputy Sheriff. In September 1993, Ledford joined the Alcohol Law Enforcement Division ("ALE") as a Special Agent in its field office in Asheville, where he served for just over five years and eventually attained the rank of Special Agent II, which was the highest available under the Division's then-extant system of classification. In the years since, ALE has adopted a three-tiered system of classifying its Special Agents based on their experience and competence into Contributing-, Journeyman-, and Advanced-levels, with recurring postings for vacancies to provide opportunities for lower level agents to compete for promotions between these ranks and pay increases within them.
 

 *269
 
 In November 1998, Ledford, a registered Democrat since the age of 18, was elected Sheriff of Madison County. Although he resigned from his employment with ALE at that time, Ledford subsequently rejoined ALE as a Special Agent Reserve in 2002 and continued to serve in that capacity throughout the next seven years of his tenure as Sheriff.
 

 In October 2009, Ledford was appointed Director of ALE by Governor Beverly Perdue upon the recommendation of her appointed Secretary of Crime Control & Public Safety, Reuben Young. As Director of ALE, Ledford served in a policy-making exempt position until the expiration of Governor Perdue's term at the end of 2012. During Ledford's tenure as Director, ALE merged with several other State law enforcement agencies into the newly created DPS, of which Young was named Secretary. In January 2012, in his final performance evaluation as Director, Ledford was assessed at the Advanced competency level and his performance was rated as "Outstanding" by his superiors. Throughout his years in law enforcement, Ledford completed hundreds of hours of advanced law enforcement training through the FBI National Academy, the DEA Drug Unit Commanders Academy, and the State's Sheriffs Training Standards Division. He also became a certified general instructor for the State, with a specialized firearms instructor certification, and taught courses in ALE basic training programs and at the community college level.
 

 In late 2012, Ledford decided that he wanted to return to the field as an ALE Special Agent after his term as Director concluded. During a training exercise in Wilmington in late October, Ledford approached Secretary Young about the possibility of obtaining a reassignment to ALE's district office in Asheville. Secretary Young advised Ledford that although he was unfamiliar with the necessary procedures for approving such a move, he was receptive to the idea, provided it could be done ethically and legally. The subject came up again several days later during a meeting in Raleigh among Secretary Young, Ledford, Chief Operating Officer of DPS Mikael Gross, Deputy Director of Operations for ALE Richard Allen Page,
 
 [1]
 
 and Director of Human Resources for DPS Alvin Ragland. After further discussion, Young directed Ledford to begin the process of requesting a reassignment and also asked Gross and Ragland to determine the legal and logistical requirements to facilitate the process.
 

 *270
 
 Pursuant to Young's request, Gross asked ALE Deputy Director for Law Enforcement Services Mark Senter whether there were any openings for a Special Agent in the Asheville office. Senter advised Gross that although there was a vacant position for a Contributing-level Special Agent in the Wilmington office, there were currently no open postings in Asheville. However, Senter also determined, based on a 2010 ALE needs-assessment and the recent retirement of an Asheville-based agent, that there was a clear
 
 *54
 
 business need for an additional Special Agent in the Asheville office, and that that need was greater than the need for an agent in Wilmington. Gross concluded that pursuant to section 18B-500(g) of our General Statutes, which provides authority for shifting ALE personnel from one district to another,
 
 see
 
 N.C. Gen.Stat. § 18B-500(g) (2015), Secretary Young could lawfully transfer the vacant Wilmington Special Agent position to the Asheville office and reclassify it from the Contributing-Level to the Advanced-Level to reflect Ledford's competency level. Senter consulted with DPS Deputy Director of Human Resources, Tammy Penny, who advised him that "the position would still have to be posted.... to ensure we meet the statut[ory] requirement [imposed by N.C. Gen.Stat. § 126-7.1(a) ] to make a position vacancy available via a minimum of a 5[-]day posting except for certain situations defined in policy" by the Office of State Personnel ("OSP") and in the State Personnel Manual. After consulting Section 2, Page 21 of the State Personnel Manual, which provides guidelines for the recruitment and posting of vacancies and lists examples for which posting requirements are inapplicable, Gross concluded that the vacant Special Agent position would not need to be posted publicly or as part of ALE's internal competitive applications process. In addition, based on their review of Section 4 of the State Human Resources Manual, which governs salaries for State employees who are demoted or reassigned, Gross and Senter determined that Ledford's salary would have to be reduced to the maximum available for an Advanced-level Special Agent.
 

 Meanwhile, Ragland contacted the Interim Director of OSP, Ann Cobb, to inquire regarding the legality of Ledford's requested reassignment. Cobb informed Ragland that such a reassignment was legally permissible. Cobb later testified that although she advised Ragland that "the reassignment technically could be done, that an agency head can waive posting, can transfer a position and have a reassignment down of an employee," she also sounded a note of caution that such a reassignment "was something to be very careful with, that there needed to be a strong business case for doing it, and that it could be challenged by employees or applicants who were interested in those positions." Cobb testified further that she advised Ragland that because Ledford needed three
 
 *271
 
 more years of service before he qualified as a career State employee, he would not be entitled to the protection from termination afforded to such employees, which meant that a new administration could terminate him without just cause.
 

 On 27 November 2012, Ledford formally requested reassignment from his position as Director to a position as a Special Agent in Asheville, effective 1 January 2013. In a memorandum to Secretary Young, Ledford stated that it was his understanding that "because my current salary exceeds the maximum pay grade for the Special Agent position, [OSP] requires a salary reduction to the maximum of my assigned position." On 29 November 2012, Ledford signed a Personnel Action Clearance ("PAC") Form requesting reassignment to an Advanced-level Special Agent position with a salary set at $65,887.00, which was the maximum available for his requested position and represented a 41% reduction from his $110,667.00 salary as ALE Director. Ledford later testified that the purpose of this PAC Form was to ensure that every individual who needed to review the propriety of the requested personnel action had the opportunity to do so as it moved through the approval process, and that his signature as "Division Director" was required to verify that his most recent employee performance evaluation was consistent with the action recommended. The form was subsequently approved and signed by Gross as Deputy Secretary for DPS, Ragland for Human Resources, Marvin Mervin for Fiscal, and Secretary Young. Young also cleared the request with Governor Perdue's office, which advised him that as long as the move was legal, the Governor had no objections. On 19 December 2012, Young issued a memorandum approving Ledford's reassignment request to a Special Agent position in ALE's Asheville office. The position was formally transferred on 1 January 2013, and Ledford began his new employment as an Advanced Special Agent for the Asheville ALE office the next day.
 

 *55
 
 In the months following his return to the field, Ledford led all agents in his new district in arrests made, and his supervisors did not receive any complaints about his performance. However, Gross, who served as DPS liaison for Republican Governor-elect Pat McCrory's Justice and Public Safety transition team in December 2012, subsequently testified that when he was asked during a transition team meeting whether or not any exempt DPS employees were being moved to non-exempt positions, he replied that Ledford was one of three such DPS employees.
 
 [2]
 

 *272
 
 Gross testified further that after news broke of Ledford's reassignment, he received a phone call from Henderson County Republican State Senator Tom Apodaca, who informed Gross that Ledford's reassignment "shouldn't have occurred and that they're going to fix that if they even have to just get rid of the position in the budget." Gross then reported Apodaca's statement to incoming-DPS Secretary Kieran J. Shanahan two days before Shanahan's scheduled swearing-in. Gross testified that during their time together on the transition team, he and Shanahan had had "intimate conversations about personnel, personnel decisions, transition, [and] recommendations for employment" within DPS. When Gross conveyed Apodaca's statement to Shanahan, Shanahan agreed, stating, "Well, you know, [Ledford's reassignment] really shouldn't have happened."
 

 On 6 February 2013, ALE Advanced-level Special Agent Kenneth Simma filed a grievance with the SAC of his district alleging that Ledford's reassignment, which Simma referred to as a "demotion," was "in direct violation of the existing [ALE] policy and contrary to all existing statute[s]." Specifically, Simma complained that Ledford's new position should have been posted so that other Advanced-level ALE Special Agents could have had an opportunity to compete for the higher pay that accompanied it. Simma also questioned Ledford's qualifications for an Advanced-level position, and alleged that Ledford's new salary created a division-wide salary inequity. Simma's grievance was denied by his district's SAC on 8 February 2013, and by ALE Acting Director Senter on 13 February 2013, both of whom concluded that the matters Simma raised in his grievance were non-grievable issues.
 

 Simma subsequently testified that he had previously been subjected to disciplinary action by Ledford when Ledford was ALE Director; that he had received outside assistance in preparing his grievance; and that he shared his grievance with another ALE Advanced-level Special Agent, Patrick Preslar, who then filed a nearly identically worded grievance against Ledford on 15 February 2013. Preslar's grievance was denied as non-grievable by his district's SAC on 19 February 2013, and Senter reached the same conclusion on appeal on 25 February 2013. Both Simma and Preslar appealed the denial of their grievances directly to Secretary Shanahan, who likewise concluded that the issues they raised were non-grievable, and thus denied their appeals. Shanahan outlined his reasoning in a memo addressed to Simma dated 4 March 2013, in which he explained that Simma's allegation of a division-wide salary inequity did not constitute a dispute over performance pay and was not timely filed; that despite Simma's complaint that Ledford's new position
 
 *273
 
 should have been posted, the ALE's Grievance Policy "does not afford employees a right to file a grievance for failing to post a vacant position"; and that although ALE agents could grieve a "denial of promotion due to failure to post," they could only prevail "when such failure arguably resulted in the grievant being denied a promotion," a requirement that Simma could not satisfy since he was already an Advanced-level Special Agent. Shanahan stated similar bases for rejecting Preslar's appeal.
 

 The grievances Simma and Preslar filed against Ledford were also reviewed by DPS Employee Relations specialist Margaret Murga. On 19 February 2013, Murga sent an email to DPS deputy general counsel Joseph Dugdale inquiring whether he had reviewed the grievances. Neither Murga nor
 
 *56
 
 Dugdale had any involvement in Ledford's reassignment, but on 25 February 2013, Dugdale replied via email to Murga that the issues raised by Simma and Preslar were non-grievable and that the "position did not have to be posted in this case because G.S. 126-5(e) specifically allows the [DPS] Secretary to demote an exempt employee from his or her position in the department." Dugdale stated further that 25 NCAC 01h.0631(e)(8) provides an exemption from the general posting requirement for "[v]acancies to be filled by an eligible exempt employee who has been removed from an exempt position and is being placed back in a position subject to all provisions of the State Personnel Act." The next day, after Murga replied to ask Dugdale whether Ledford had been demoted or reassigned, Dugdale responded that Ledford "was transferred to a lower position, his salary was reduced and his responsibilities are less demanding; therefore it is a demotion." In response, Murga sent Dugdale an email with the notation "fyi" and a 26-page attachment that included documentation from Ledford's reassignment. On 27 February 2013, Dugdale replied to Murga that he had reviewed the documents she had sent him, believed they "tend[ed] to shed a somewhat different light on what happened in the 'reallocation' of Director Ledford," and posed a list of approximately 10 follow-up questions for Murga to investigate, including whether Ledford had been reassigned to a vacant position or had been transferred into a newly created position; whether the position was required to be posted; whether Ledford's transfer should have been approved by OSP and, if so, whether it had been and by whom; and whether it was normal practice for Gross to have signed off on Ledford's PAC Form as Deputy Director.
 

 In the weeks that followed, Murga reviewed ALE and OSP policies regarding salary and posting requirements; found evidence of three or four instances in 2012 when openings for Advanced-level ALE Special Agent positions had been posted internally for competitive applications;
 

 *274
 
 confirmed that Ledford's new position had originally been classified as a Contributing-level opening in ALE's Wilmington office; and concluded that Ledford's position had never been posted, nor had an updated job description been provided, nor had OSP given approval to re-classify it from the Contributing-to the Advanced-level. However, Murga later testified that she was unaware that there had been a need for another Special Agent in the Asheville office since 2010, and she also acknowledged that she had been unable to fully answer several of Dugdale's questions-and had provided erroneous answers to others-because she did not speak to anyone involved in the decision-making process for Ledford's reassignment during her investigation into Ledford's reassignment.
 

 At some point, Dugdale advised Commissioner of Law Enforcement Frank Perry that Murga had discovered that "there was more to [the] story" of Ledford's reassignment, and Perry urged Dugdale to continue to articulate, record, and discuss the findings from Murga's investigation. In early March, Murga and Dugdale met with several OSP representatives, who informed them that Ledford's new position should have been posted. Murga then relayed her findings to her supervisor, DPS Employee Relations manager Kim Davis-Gore. On 14 March 2013, Murga and Dugdale shared the results of their investigation with Perry during a brief meeting. That same day, Dugdale authored a memo to Perry in which he explained that Davis-Gore had consulted with HR and OSP regarding the alleged irregularities involved in Ledford's reassignment and "provided what they consider to be two (2) viable options" for addressing the situation. As Dugdale explained:
 

 Option 1 is to simply ignore the irregularities and maintain the status quo. Option 2 is to undo the wrong by moving the position back to Wilmington and readjusting it back to the contributing competency level since there is no supporting documentation to justify why it was upgraded other than to accommodate Director Ledford's request for a reallocation. They believe, however, that because John Ledford is currently in the position, he should be afforded an opportunity to transfer with the position.
 

 Despite Davis-Gore's recommendations, Dugdale opined in his memorandum to Perry
 
 *57
 
 that while he agreed that affording Ledford the opportunity to transfer to Wilmington "is an option," he did not agree that it was required because Ledford "is not a career state employee and, therefore, is not afforded the protections of the State Personnel Act." Nevertheless, as Dugdale also cautioned, "It should be pointed out that [Ledford] most likely will challenge [DPS] in either event arguing
 
 *275
 
 that the decision to move the position was based on his political affiliation" in violation of section 126-36 of our General Statutes, and thus DPS would "need to show that whatever action is taken, is based on an identifiable legitimate business need."
 

 On 10 April 2013, Ledford received a telephone call from ALE Acting Director Senter, who informed Ledford that he had been ordered to terminate Ledford's employment and would be forwarding a memorandum authored by Perry ("the Perry Memo") explaining the reasons for this decision. The Perry Memo, a version of which was hand-delivered to Ledford later that day,
 
 [3]
 
 explained that DPS's Employee Relations Section had "uncovered ethical and legal concerns" while reviewing the two grievances filed against Ledford's reassignment. Specifically, the Perry Memo characterized the fact that Ledford had signed the PAC Form he used to request his reassignment on the line designated for the ALE Director's signature as an "inappropriate deviation from normal practice [which] had the effect of sending a clear message that neither [HR] nor Fiscal had any real authority to deny your request." The Perry Memo also took issue with Ledford's salary, deeming it excessive, given that it made Ledford the highest-paid ALE Special Agent in the State, and in violation of State Personnel policy. Further, the Perry Memo stated that there had been no legitimate business need to transfer any Special Agent position from Wilmington to Asheville or to reclassify it from the Contributing-level to the Advanced-level, and that even if there had been a legitimate business need, the position should have been posted internally for competitive applications as required by State law and departmental policy. In light of the fact that Ledford did not qualify as a career State employee, the Perry Memo determined there was no lawful authority for Ledford's reassignment from his exempt position as Director to a non-exempt position, and therefore concluded that Ledford's "so-called 'reassignment' was nothing more than an attempt to circumvent the provisions of the State Personnel Act in that, at the time you submitted your request, you knew a new Department Head would be appointed effective January 1, 2013," once Governor McCrory took office, "and that it was inevitable that you would be separated from state service." Finally, as the Perry Memo summarized, Ledford
 

 *276
 
 either knew, or should have known: 1. that your reassignment circumvented the existing statutory scheme pertaining to policy exempt employees; 2. that by reassigning yourself to a position to which you were not entitled, you violated the promotional rights of subordinate employees; 3. that, even if you were entitled to a reassignment to a Special Agent position, the salary requested and approved is excessive pursuant to state personnel policy; and 4. the approved salary amount exceeds the salary of every other Special Agent in the division, thereby creating an unwarranted salary inequity. As ALE Director, you knew or should have known that you did not have any reassignment rights, that it was inappropriate to reallocate and subsequently transfer a position for any purpose other than a legitimate business need, that the position you were "reassigned" to was required to be posted, and that your new salary was clearly excessive. Accordingly, your participation in the events described herein cannot be viewed as anything less than unacceptable personal conduct on your part.
 

 The Perry Memo concluded by informing Ledford that he would be terminated effective immediately, that he had no right to
 
 *58
 
 appeal the decision, and that his position in Asheville would be moved back to Wilmington and reclassified at the Contributing-level due to the "total lack of any identifiable legitimate business need to justify" the original transfer. The Perry Memo was subsequently released to the media. On 17 April 2013, Secretary Shanahan sent an email to Governor McCrory's Chief of Staff, Thomas Stith, detailing several scheduled public forums and providing a link to a news story on the
 
 Asheville Citizen-Times
 
 website covering Ledford's termination. In his email, Shanahan advised, "Thought you and G should be aware of Ledford dismissal-done by the book. Assume it will be appealed."
 

 Procedural History
 

 On 8 May 2013, Ledford filed a petition for a contested case hearing with the OAH, alleging that his dismissal was without just cause and resulted from discrimination based on his political affiliation in violation of N.C. Gen.Stat. § 126-34.1(a)(2)(b) (2011),
 
 repealed by
 
 2013 N.C. Sess. Law 382, § 6.1.
 
 [4]
 
 On 16 August 2013, DPS filed a motion to dismiss
 
 *277
 
 Ledford's claim for dismissal without just cause, given the fact that Ledford was not a career State employee, as well as a motion for summary judgment regarding Ledford's political affiliation discrimination claim. By order entered 1 November 2013, ALJ Morrison granted DPS's motion to dismiss Ledford's claim for dismissal without just cause, but denied the motion for summary judgment.
 

 A three-day hearing on Ledford's political affiliation discrimination claim began on 2 December 2013 with ALJ Morrison presiding. During the hearing, Ledford testified that he had requested to be reassigned as a Special Agent because he missed working in the field and wanted to continue serving the State. Ledford testified further that apart from making initial inquiries about the proper way to return to the field, he was minimally involved in the decision-making process surrounding his reassignment and that Gross and Ragland had researched the appropriate procedures and told him that everything checked out. Ledford denied the Perry Memo's accusation that he approved his own reassignment, testified that it was his regular duty as ALE Director to sign employee PAC Forms in order to verify that their most recent performance evaluations were consistent with the personnel actions recommended, and explained that he had signed his own PAC Form in order to ensure that every individual who needed to review the propriety of his requested reassignment had the opportunity to do so as it moved through the approval process. Ledford also testified that there had indeed been a legitimate business need to reallocate a Special Agent position to Asheville, and noted that irrespective of the Perry Memo's promise to move the vacancy back to Wilmington, the number of ALE Special Agents in the Asheville office had remained the same as before his dismissal. Regarding his salary, Ledford testified on cross-examination, "The extent of my involvement in the setting of my salary was somebody walked into [my office] and handed me a piece of paper that says, you're taking a 41 percent reduction in pay, and this is your salary. And that's it." In addition, Ledford testified that not all vacancies that had arisen during his tenure as ALE Director had been posted, and it was his understanding that OSP and the State Personnel Manual provided for exceptions from the general posting requirement. Regarding his dismissal, Ledford noted his surprise to learn that he was even being investigated, let alone terminated, in light of the ALE's then-extant disciplinary procedures, which required that all employees, including probationary employees, be advised of any allegations against them and afforded an opportunity to respond before being subjected to discipline.
 

 *278
 
 Ledford also presented testimony during his case-in-chief from Gross, who testified about the phone call he received from Senator Apodaca and incoming-Secretary Shanahan's reaction to it. When DPS objected to this testimony on the basis of hearsay, the following exchange occurred:
 

 *59
 
 [DPS Counsel]: Objection, Your Honor. I don't believe Senator Apadaka [sic] is a witness here today. He hasn't been identified. We're into hearsay testimony now for sure.
 

 THE COURT: Well, he can say that he got a call.
 

 [DPS Counsel]: And that wasn't my objection, Your Honor. He's testifying to exactly what Senator Apadaka [sic] may or may not have told him, which is not just, I received a phone call from Senator Apadaka [sic]. I wouldn't have an objection to hearsay on that grounds because he's not getting into the truth of what's been asserted.
 

 THE COURT: Well, I tell you, because he's an officer of the [c]ourt, an attorney and all, and the OAH rules provide that an ALJ can admit any evidence that has probative value and determine what weight to give it, I'm going to overrule the objection and let him testify because hearsay is if it's unreliable and all, so I overrule.
 

 Gross also testified that he reviewed Section 2, Page 21 of the State Personnel Manual and concluded that the position to which Ledford was reassigned did not need to be posted because it fit the exception for a vacancy "to be filled by an eligible exempt employee who has been removed from an exempt position and is being placed back in a position subject to all provisions of the State Personnel Act." Regarding Ledford's salary, Gross testified that he and Senter determined that State policy required that it be set at the maximum available rate for an Advanced-level Special Agent based on their review of Section 4, Page 29 of the State Human Resources Manual, which provides that "[w]hen the employee's current salary is above the maximum of the range for the lower class, the salary shall be reduced at least to the maximum of the lower range." Gross acknowledged that Ledford's new salary might not have been popular among the ALE's ranks because, as he explained,
 

 I've worked for ALE for a number of years and I've worked in State government for a lot of years. And when it comes to salary, everybody is unhappy. I don't believe that any one person in ALE who [has] ever watched somebody else
 
 *279
 
 get promoted has not said, "They don't deserve it," or, "I would have done a better job." I believe that no matter who would have been put in [Ledford's] position, no matter if anybody made $1,000 more, somebody else would have said "There's an inequity," and they would have thought that it was grievable.
 

 Nevertheless, Gross testified that Ledford's salary did not result in a grievable inequity because State policy required it and also because the next highest paid ALE Advanced-level Special Agent at the time of Ledford's termination had a salary of approximately $61,000.00, and "in order for there to be a grievable inequity, there has to be more than $10,000 between the person who is at top pay and the next person below him."
 

 In addition to Gross's testimony, Ledford presented testimony from the other individuals who were directly involved in the decision-making process that led to his reassignment. Senter, Page, and Ragdale each testified that there had been a legitimate need for an additional Special Agent in Asheville; that they believed OSP regulations allowed for Ledford's reassignment without posting the position and required that his salary be set at the maximum rate available; and that they could not remember a single previous instance when an ALE employee had been terminated by telephone or any other method without first being advised of the allegations against him and afforded an opportunity to respond to those allegations. Indeed, Senter testified that although it was common for HR and DPS to review grievances from ALE employees, he was unaware of any prior examples of such reviews resulting in disciplinary investigations like the one conducted by Murga and Dugdale. Both Senter and Page continued to work for ALE after the McCrory Administration took office, but neither was approached by Murga, Dugdale, Perry, or anyone else during DPS's disciplinary investigation into Ledford's reassignment.
 

 Former Secretary Young testified that although he was unaware of any previous instances of an ALE Director or other policymaking
 
 *60
 
 exempt employee being transferred downward, he was certain that Ledford had not reassigned himself. Young testified further that the ultimate decision to approve Ledford's request was his own to make; that he was satisfied that Gross, Senter, and Ragland had followed appropriate procedures in terms of transferring the position to Asheville and reclassifying its experience level; and that neither OSP nor HR nor the Governor's office had objected. Young also testified that Ledford's salary was legally permissible and, although he conceded on cross-examination that in his view, Section 4 of the State Human Resources Manual did not
 
 require
 

 *280
 
 Ledford's salary to be set at the maximum rate, he believed it was appropriate for an employee with Ledford's experience and qualifications. Indeed, Young testified that he believed it had been in ALE's best interests to retain Ledford as a Special Agent, given his longstanding dedication to the Division and the fact that Ledford "was probably one of the most hard-working and one of the most loyal employees I have ever worked with or had ever been around. Quite frankly, in that position, I wish I would have had twenty thousand more of [him]."
 

 At the close of Ledford's evidence, DPS made a motion for directed verdict in its favor, which ALJ Morrison denied. Throughout its case-in-chief, DPS contended that irrespective of whether Ledford could make out a
 
 prima facie
 
 case for political affiliation discrimination, his claim should ultimately fail because his termination was based on the legitimate, nondiscriminatory reasons detailed in the Perry Memo. Murga and Dugdale testified about the investigation they undertook in response to the grievances filed by Simma and Preslar. In keeping with testimony by Cobb and Penny from OSP, both Murga and Dugdale testified that they did not believe OSP policy required Ledford's new salary to be set at the maximum rate; that they did not believe the exception to the posting requirement provided under Section 2, Page 21 of the State Personnel Manual that Gross had identified actually applied to Ledford's new position because in their view, Ledford did not qualify as an "eligible" employee, given that he had not yet attained career status; and that once Ledford assumed his new position, he was a non-exempt probationary employee who could be terminated for any reason so long as the reason was not illegal.
 

 Murga testified further that she was unable to find any evidence that OSP had given approval to re-classify Ledford's new position to the Advanced-level; that she was unaware of any legitimate business need to transfer a position to Asheville; and that she believed the position should have posted internally for competitive applications as several other Advanced-level vacancies had been posted in 2012. However, Murga acknowledged on cross-examination that she never spoke to anyone who had been involved in the decision-making process for Ledford's reassignment.
 
 [5]
 
 Dugdale testified that although he initially believed
 
 *281
 
 Ledford's reassignment was proper when Murga brought her concerns to his attention, he now believed that he should have been consulted directly during the decision-making process. Dugdale testified further that he viewed the fact that Ledford had signed off on his own PAC Form as "totally inappropriate" and considered Ledford's request for the maximum available salary a "total breach of trust." Dugdale also testified that although Murga's supervisor, Davis-Gore, had provided only "two viable options" for how DPS should deal with the situation-either do nothing or else allow Ledford the opportunity to transfer to Wilmington-the OSP representatives he and Murga had met with prior to informing Davis-Gore of their investigation's findings had indicated that they would be "comfortable"
 
 *61
 
 with Ledford's dismissal. Like Murga, Dugdale testified that during the investigation of Ledford's reassignment, he had not spoken to anyone involved in the decision to approve Ledford's request.
 

 By the time of the hearing, Perry had been promoted by Governor McCrory to the position of DPS Secretary. Perry testified that he first learned of Ledford's reassignment in the "Under the Dome" section of the
 
 News & Observer
 
 (Raleigh), but did not look any deeper into the matter until Dugdale notified him of Murga's investigation, and that he never consulted with Secretary Shanahan or Governor McCrory or anyone other than Dugdale or Murga about Ledford's reassignment or the two grievances filed against him. When asked on direct examination why he chose to dismiss Ledford despite the fact it was not among the "two viable options" Davis-Gore had recommended, Perry emphasized the total lack of any State or federal precedent to allow for an action like Ledford's reassignment, which he believed, based on his discussions with Dugdale and Murga, amounted to "simply self-dealing to the level of a violation of law and policy." When asked why he did not consult with anyone who had been involved in the decision-making process for approving Ledford's reassignment, Perry stated that, "I felt to keep it clean, I need not consult others; and I made the decision based on the evidence I saw." When asked on cross-examination on what specific evidence he based his determination that Ledford's reassignment violated State law and OSP policy, Perry alluded to the fact that Ledford's new
 
 *282
 
 position was never posted and his reassignment had not been approved by OSP. However, Perry also conceded that he had no idea Cobb had been consulted as Interim Director of OSP in 2012 and had advised that the reassignment was, in fact, legal.
 

 When asked for specific evidence to support his conclusion that Ledford had reassigned himself, Perry initially struggled to identify any basis to support his accusations of self-dealing before eventually testifying that Young's 19 December 2012 memo approving Ledford's reassignment "says that he had requested the assignment, 'he' being Ledford." Perry subsequently conceded that such a request would not itself be illegal, but insisted that "[i]t seems to me the reassignment in its totality was a matter of violation of State law and [OSP] policy" and later clarified that it was his understanding "that there was no precedent [for] this move, period." Throughout his testimony, Perry contended that the decision to dismiss Ledford was his alone; however, on cross-examination, Perry acknowledged that he was not the author of the Perry Memo and that he did not know who wrote it or why two different versions had been prepared. In addition, Perry acknowledged that after Ledford's dismissal, he signed a formal report to the Criminal Justice Enforcement and Training Standards Commission that stated that Ledford had not been subject to any investigation or inquiry concerning illegal or unprofessional conduct within 18 months of his dismissal.
 

 On 31 December 2013, ALJ Morrison issued a Final Decision in this matter finding in Ledford's favor that his dismissal was the result of discrimination based on his political affiliation. In his Final Decision, ALJ Morrison made factual findings that Ledford was well-qualified to be an Advanced-level ALE Special Agent; that former Secretary Young had acted pursuant to his statutory authority in approving Ledford's reassignment request; that upon learning of Ledford's reassignment, incoming Republican officials in Governor McCrory's Administration had been disappointed Ledford was no longer in a policy-making exempt position where he would be subject to termination; that upon returning to the field in a non-exempt position, Ledford performed very well; that Perry had made his decision to terminate Ledford based largely on two already dismissed employee grievances despite the fact that Perry "knew nothing about [Ledford's] qualifications, never sought information from him, Secretary Young, his deputies, or his HR personnel" and "also ignored suggestions from employee relations and state personnel representatives to maintain the status quo or move the position and [Ledford] to Wilmington"; and that, contrary to ALE's internal disciplinary policy,
 
 *283
 
 Ledford was never given
 
 *62
 
 notice of the charges against him or an opportunity to respond.
 
 [6]
 

 Based on these findings of fact, ALJ Morrison concluded that Ledford had met his
 
 prima facie
 
 burden "by establishing that he was a very prominent Democrat non-policymaking employee of [DPS] brought in during a Democrat[ic] administration who was hoping to continue his State employment under an incoming Republican administration." Moreover, Ledford had also established that DPS
 

 treated him differently than other ALE Special Agents in failing to follow its own ALE internal disciplinary policy by not providing him notice of his being investigated; not allowing him an opportunity to respond to the charges against him by two disgruntled employees who[ ] had been disciplined; not involving his immediate supervisors in an investigation and decision to terminate his employment. [Ledford] has also raised inferences by showing [DPS] focused upon holding him responsible for actions by his Democrat[ic] superiors in late 2012 and terminating him without regard to the very good job he was doing as a field agent in 2013; failing to provide a probationary employee with any counseling or suggestions concerning how he could improve his job performance; ignoring suggestions from personnel and legal professionals to let the matter rest or transfer the position with [Ledford] back to Wilmington. The Republican transition team had inquired about DPS plans to move any exempt employees into non-exempt
 
 *284
 
 positions prior to the administration change and were told of plans concerning [Ledford]. When informed about a Republican State Senator's negative remarks concerning the personnel transaction, Republican Secretary appointee Shanahan remarked "That should not have happened," indicating his state of mind coincided with the senator's and transition team's concerning [Ledford]. Finally, Secretary Shanahan thought it important to send an email at 9:47pm notifying the governor and his chief of staff that [Ledford] had been terminated, which suggests a political purpose was behind it. [Ledford] was a marked man politically.
 

 After determining that Ledford had established his
 
 prima facie
 
 case, ALJ Morrison noted that the burden shifted to DPS to present evidence that Ledford's termination was based on a legitimate, nondiscriminatory reason and concluded that DPS had met this burden of production "by establishing that two disgruntled, formerly disciplined agents filed grievances complaining about how [Ledford] became a field agent and his salary, which led to an investigation resulting in his termination without following the ALE's internal disciplinary procedures." At that point, as ALJ Morrison explained, the burden shifted back to Ledford "to prove that [DPS's] reason for terminating [Ledford] as it did was merely a pretext, and not a legitimate, nondiscriminatory reason."
 

 ALJ Morrison concluded that Ledford had met his ultimate burden of proving by a preponderance of the evidence that the purportedly legitimate reasons DPS had given to justify terminating Ledford were a pretext for political discrimination. In support of this conclusion, ALJ Morrison explained that in addition to relying on Ledford's
 
 prima facie
 
 evidence, "it did not seem credible that
 
 *63
 
 [DPS's] action was not politically motivated," given that Ledford
 

 had been performing very well as a field agent. His background, training, and experience qualified him very well for the [A]dvanced-level position and approved salary. It is more likely than not that had he not been such a prominent, life-long Democrat from Madison County he would not have been terminated, for the State needs such well-qualified ALE Special Agents.
 

 Terminating [Ledford] in disregard of ALE's internal disciplinary policy and past practices with other agents indicates that it is more likely than not that political affiliation
 
 *285
 
 was a factor. [DPS's] primary concern appeared to be to reverse the decision by Secretary Young to demote/ transfer [Ledford], with no regard to how he was performing his duties as a field agent and without exploring fairly all alternatives to termination. Secretary Young had exercised due diligence prior to deciding to demote/ transfer/reassign [Ledford] who was at the time a policymaking employee whose consent was unnecessary.
 

 Based on these conclusions, ALJ Morrison ordered that Ledford be reinstated to his position as an Advanced-level Special Agent in the Asheville ALE office at his previous salary rate and paid all compensation he otherwise would have been entitled to receive since the date of his dismissal, plus attorney fees and costs.
 

 On 30 January 2014, DPS filed a petition for judicial review in Madison County Superior Court pursuant to section 150B-43 of our General Statutes. After a hearing held on 1 December 2014, the court entered an order on 29 December 2014 affirming ALJ Morrison's Final Decision. On 30 January 2015, DPS filed notice of appeal to this Court.
 

 Analysis
 

 DPS argues that ALJ Morrison erred as a matter of law in concluding that Ledford's termination resulted from political affiliation discrimination. We disagree.
 

 Standard of Review
 

 Section 150B-51 of our State's Administrative Procedure Act ("APA") establishes the standard of review we apply when reviewing an ALJ's Final Decision and provides that while this Court may affirm or remand such a decision for further proceedings, we may only reverse or modify such a decision
 

 if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
 

 (1) In violation of constitutional provisions;
 

 (2) In excess of the statutory authority or jurisdiction of the agency or [ALJ];
 

 (3) Made upon unlawful procedure;
 

 (4) Affected by other error of law;
 

 *286
 
 (5) Unsupported by substantial evidence admissible under
 

 G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
 

 (6) Arbitrary, capricious, or an abuse of discretion.
 

 N.C. Gen.Stat. § 150B-51(b) (2015). Our Supreme Court has observed that the first four grounds enumerated under this section "may be characterized as law-based inquiries," whereas the final two grounds "may be characterized as fact-based inquiries."
 
 N.C. Dep't of Envt. & Natural Res. v. Carroll,
 

 358 N.C. 649
 
 , 659,
 
 599 S.E.2d 888
 
 , 894 (2004) (citations and internal quotation marks omitted). Moreover, "[i]t is well settled that in cases appealed from administrative tribunals, questions of law receive
 
 de novo
 
 review, whereas fact-intensive issues such as the sufficiency of the evidence to support [an ALJ's] decision are reviewed under the whole record test."
 

 Id.
 

 (citation, internal quotation marks, and certain brackets omitted).
 

 Under the
 
 de novo
 
 standard of review, the Court "considers the matter anew and freely substitutes its own judgment...."
 
 Id.
 
 at 660,
 
 599 S.E.2d at 895
 
 (citation, internal quotation marks, and brackets omitted). However, our Supreme Court has made clear that even under our
 
 de novo
 
 standard, a court reviewing a question of law in a contested case is without authority to make new findings of fact.
 
 See
 

 id.
 
 at 662,
 
 599 S.E.2d at 896
 
 ("In a contested case under the APA, as in a legal proceeding initiated in District or Superior Court, there is but one fact-finding
 
 *64
 
 hearing of record when witness demeanor may be directly observed. Thus, the ALJ who conducts a contested case hearing possesses those institutional advantages that make it appropriate for a reviewing court to defer to his or her findings of fact.") (citations and internal quotations marks omitted). Under the whole record test, the reviewing court "may not substitute its judgment for the [ALJ's] as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter
 
 de novo.
 
 "
 
 Id.
 
 at 660,
 
 599 S.E.2d at 895
 
 (citation omitted). Instead, we must examine "all the record evidence-that which detracts from the [ALJ's] findings and conclusions as well as that which tends to support them-to determine whether there is substantial evidence to justify the [ALJ's] decision."
 

 Id.
 

 Substantial evidence is "relevant evidence a reasonable mind might accept as adequate to support a conclusion."
 

 Id.
 

 (citations omitted). We undertake this review with a high degree of deference because it is well established that
 

 [i]n an administrative proceeding, it is the prerogative and duty of [the ALJ], once all the evidence has been presented
 
 *287
 
 and considered, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. The credibility of witnesses and the probative value of particular testimony are for the [ALJ] to determine, and [the ALJ] may accept or reject in whole or part the testimony of any witness.
 

 City of Rockingham v. N.C. Dep't of Envt. & Natural Res., Div. of Water Quality,
 

 224 N.C.App. 228
 
 , 239,
 
 736 S.E.2d 764
 
 , 771 (2012).
 

 Background Law
 

 The sole issue before ALJ Morrison was whether Ledford was improperly terminated from his position as an ALE Advanced-level Special Agent due to illegal discrimination based on his political affiliation. On issues of employment discrimination, North Carolina courts look to federal law for guidance.
 
 See
 

 N.C. Dep't of Corr. v. Gibson,
 

 308 N.C. 131
 
 , 136,
 
 301 S.E.2d 78
 
 , 82 (1983). Our Supreme Court has adopted the same three-pronged burden-shifting approach that the United States Supreme Court uses for proving discrimination:
 

 (1) The claimant carries the initial burden of establishing a
 
 prima facie
 
 case of discrimination.
 

 (2) The burden shifts to the employer to articulate some legitimate nondiscriminatory reason for the [adverse action affecting the employee].
 

 (3) If a legitimate nondiscriminatory reason for [the adverse action] has been articulated, the claimant has the opportunity to show that the stated reason for [the adverse action] was, in fact, a pretext for discrimination.
 

 Id.
 

 at 137
 
 ,
 
 301 S.E.2d at
 
 82 (citing
 
 McDonnell Douglas Corp. v. Green,
 

 411 U.S. 792
 
 ,
 
 93 S.Ct. 1817
 
 ,
 
 36 L.Ed.2d 668
 
 (1973) ). As our Supreme Court observed in Gibson, "[t]he burden of establishing a
 
 prima facie
 
 case of discrimination is not onerous" and "may be established in various ways," including a showing of dissimilar treatment of the claimant as compared to other employees.
 
 Gibson,
 

 308 N.C. at 137
 
 ,
 
 301 S.E.2d at 82-83
 
 (citations omitted). This is because
 

 [t]he showing of a
 
 prima facie
 
 case is not equivalent to a finding of discrimination. Rather, it is proof of actions taken by the employer from which a court may infer discriminatory intent or design because experience has
 
 *288
 
 proven that in the absence of an explanation, it is more likely than not that the employer's actions were based upon discriminatory considerations.
 

 Id.
 

 at 138
 
 ,
 
 301 S.E.2d at 83
 
 (citations omitted).
 

 If the employee succeeds in establishing a
 
 prima facie
 
 case for political affiliation discrimination, "the employer has the burden of
 
 producing
 
 evidence to rebut the presumption of discrimination raised by the
 
 prima facie
 
 case."
 

 Id.
 

 (citations omitted; emphasis in original). "To rebut the presumption of discrimination, the employer must clearly explain by admissible evidence, the nondiscriminatory reasons for the employee's rejection or discharge."
 

 Id.
 

 at 139
 
 ,
 
 301 S.E.2d at 84
 
 . If the employer succeeds
 
 *65
 
 on this second prong, the burden then shifts back to the employee, who is "given the opportunity to show that the employer's stated reasons are in fact a pretext for intentional discrimination."
 

 Id.
 

 Burden-shifting Prong 1: Ledford's prima facie case First element: non-policymaking position
 

 DPS argues first that ALJ Morrison's Final Decision must be reversed because Ledford failed to establish a
 
 prima facie
 
 case of political affiliation discrimination given that he obtained his position as an Advanced-level Special Agent through "purely political machinations, and not through any competitive selective process." We disagree.
 

 This Court has explained that to meet the initial burden of establishing a
 
 prima facie
 
 case for political affiliation discrimination, an employee must show that:
 

 (1) the employee work[ed] for a public agency in a non-policymaking position (i.e., a position that does not require a particular political affiliation), (2) the employee had an affiliation with a certain political party, and (3) the employee's political affiliation was the cause behind, or motivating factor for, the ... adverse employment action.
 

 Curtis v. N.C. Dep't of Transp.,
 

 140 N.C.App. 475
 
 , 479,
 
 537 S.E.2d 498
 
 , 501-02 (2000).
 

 The gravamen of DPS's argument on this point appears to be that Ledford cannot satisfy the first element required to meet his
 
 prima facie
 
 case. However, DPS cites no authority to support its implicit premise that the purportedly improper manner in which DPS alleges Ledford was reassigned to his position as an Advanced-level Special Agent in
 
 *289
 
 ALE's Asheville office somehow precludes him from qualifying as having "work[ed] for a public agency in a non-policymaking position (i.e., a position that does not require a particular political affiliation)[.]"
 
 Id.
 
 at 479,
 
 537 S.E.2d at 501
 
 . While this argument is certainly relevant to the second and third prongs of the burden-shifting analysis our Supreme Court articulated in
 
 Gibson,
 
 we are wholly unpersuaded it has any bearing on this specific issue. Moreover, our General Statutes define an exempt policymaking position as a position
 

 delegated with the authority to impose the final decision as to a settled course of action to be followed within a department, agency, or division, so that a loyalty to the Governor or other elected department head in their respective offices is reasonably necessary to implement the policies of their offices.
 

 N.C. Gen.Stat. § 126-5(b)(3) (2015). Although Ledford's prior position as ALE Director certainly fits these criteria, the record is devoid of any evidence that "loyalty to the Governor" is a required attribute of the ALE Special Agent position from which Ledford was terminated, or that Ledford had any authority to "impose the final decision as to a settled course of action to be followed within [ALE]" while serving in that role.
 
 See id.; see also
 

 Curtis,
 

 140 N.C.App. at 479
 
 ,
 
 537 S.E.2d at 502
 
 (finding the petitioner satisfied the first element of his
 
 prima facie
 
 case by demonstrating his job in the Department of Motor Vehicles Enforcement Section "is not a policymaking position for which a particular political affiliation may be required"). Consequently, we find DPS's argument on this issue to be without merit, and we conclude that Ledford worked for a public agency in a non-policymaking position at the time of his termination.
 

 Third element: causation
 

 [7]
 

 DPS argues next that Ledford failed to establish the third required element of his
 
 prima facie
 
 case because there is no competent evidence in the record to support any inference that Ledford's termination was politically motivated. Specifically, DPS complains that Gross's testimony about the phone call he received from Republican State Senator
 
 *290
 
 Apodaca, and about incoming-DPS Secretary Shanahan's reaction to that call, was the only evidence that could support an
 
 *66
 
 inference of political motivation, but that this testimony should have been excluded as inadmissible hearsay. We are not persuaded.
 

 Hearsay is "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen.Stat. § 8C-1, Rule 801 (2015). Our State's APA provides that in all contested cases, "[e]xcept as otherwise provided, the rules of evidence as applied in the trial division of the General Court of Justice shall be followed; but, when evidence is not reasonably available under the rules to show relevant facts, then the most reliable and substantial evidence shall be admitted." N.C. Gen.Stat. § 150B-29(a). Title 26, Chapter 3 of the North Carolina Administrative Code governs the procedures to be followed during OAH hearings and provides that an ALJ "may admit all evidence that has probative value." 26 N.C.A.C. 03.0122(1) (2015).
 

 In the present case, as noted
 
 supra,
 
 during the OAH hearing, Gross testified over DPS's hearsay objection that Apodaca told him Ledford's reassignment "shouldn't have occurred and that they're going to fix that if they even have to just get rid of the position in the budget," and that Shanahan had agreed that the reassignment "really shouldn't have happened." When DPS objected that Gross's testimony was hearsay offered to prove the truth of the matter asserted, ALJ Morrison correctly noted that the OAH rules "provide that an ALJ can admit any evidence that has probative value and determine what weight to give it" before he admitted Gross's challenged testimony.
 

 Given that Ledford was not offering the statements by Apodaca and Shanahan to prove the truth of the matters they asserted-that is, that his reassignment was wrong and should not have occurred-but instead to show their existing mental states and motives, we are unpersuaded by DPS's argument that Gross's challenged testimony should have been barred as hearsay.
 
 See
 
 N.C. Gen.Stat. § 8C-1, Rule 803(3). Further, even assuming
 
 arguendo
 
 these statements were hearsay, our General Assembly, through the Administrative Code, has entrusted ALJs with broad discretion to admit probative evidence during administrative hearings, and we do not view ALJ Morrison's decision to admit Gross's challenged testimony as an abuse thereof. Indeed, Gross's challenged testimony is highly probative of Ledford's
 
 prima facie
 
 case, insofar as it tends to show that even before Murga and Dugdale began their disciplinary investigation into Ledford's reassignment, a prominent Republican lawmaker from Ledford's part of the State voiced his displeasure that
 
 *291
 
 Ledford had been reassigned to a non-policymaking exempt position and planned to take action, if necessary through the budget process, to eliminate Ledford's new position. The challenged testimony also tends to show that Shanahan, the top political appointee assigned by the McCrory Administration to run DPS, was aware of the partisan backlash to Ledford's reassignment and agreed the reassignment should not have occurred.
 
 [8]
 

 DPS argues that even if Gross's challenged testimony should not have been barred as hearsay, it still should have been excluded as irrelevant and prejudicial. Under Rule 401 of the North Carolina Rules of Evidence, evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen.Stat. § 8C-1, Rule 401. However, evidence that is not relevant is inadmissible,
 
 see
 
 N.C. Gen.Stat. § 8C-1, Rule 402, and even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C. Gen.Stat. § 8C-1, Rule 403. Here, while conceding that "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision" can constitute direct evidence of discrimination,
 
 Hill v. Lockheed Martin Logistics Mgmt.,
 

 354 F.3d 277
 
 , 284-85 (4th Cir.2004),
 
 abrogation on other grounds recognized by
 

 Foster
 

 *67
 

 v. Univ. of Md.-E. Shore,
 

 787 F.3d 243
 
 (4th Cir.2015), DPS insists that Gross's challenged testimony was irrelevant because the statements by Apodaca and Shanahan in late 2012 were stray or isolated remarks unrelated to showing Perry's motivations for terminating Ledford in April 2013, and were also prejudicial because they represented the only evidence that could support ALJ Morrison's determinations that Ledford "was a marked man politically" and that his termination was politically motivated.
 

 In support of this argument, DPS relies primarily on Perry's testimony during the OAH hearing that the decision to terminate Ledford was his alone, and that he did not consult with Apodaca, Shanahan, or anyone other than Murga and Dugdale in reaching that decision. However, the record in this case also includes evidence that Shanahan treated the matter of Ledford's reassignment as something of a priority, given that
 
 *292
 
 he inquired about reassignments early on in the transition process and subsequently considered Ledford's termination important enough to advise the Governor's Chief of Staff about in a late-night email. Moreover, as discussed in greater detail
 
 infra,
 
 our review of the record, including Perry's testimony under cross-examination, reveals that Ledford's counsel raised serious doubts about the process through which Perry reached his decision to terminate Ledford, as well as the credibility of the purportedly legitimate nondiscriminatory reasons Perry and other DPS witnesses articulated for Ledford's termination. To the extent the evidence in the record and testimony during the OAH hearing supports conflicting inferences, it is well established that it is the ALJ's prerogative and duty "to determine the weight and sufficiency of the evidence" and "the credibility of witnesses and the probative value" of their testimony.
 
 City of Rockingham,
 

 224 N.C.App. at 239
 
 ,
 
 736 S.E.2d at 771
 
 .
 

 Furthermore, although DPS's argument that the probative value of Gross's challenged testimony was far outweighed by its potentially prejudicial impact focuses intensely on the last three sentences of a lengthy paragraph in which ALJ Morrison determined that Ledford had satisfied his
 
 prima facie
 
 burden, we note here that the very same paragraph of the Final Decision identifies several additional bases beyond Gross's challenged testimony to support this legal conclusion. Indeed, as ALJ Morrison explained, the evidence in the record and the testimony introduced during the OAH hearing tended to show that DPS: (a) never sought input from any of the decision-makers behind Ledford's reassignment in 2012 during its investigation into and decision to terminate his employment; (b) failed to follow ALE's internal disciplinary policy and therefore DPS "treated [Ledford] differently than other ALE Special Agents" by failing to provide him with notice that he was being investigated or any opportunity to respond to the charges against him; (c) ignored "suggestions from personnel and legal professionals to let the matter rest or transfer the position with [Ledford] back to Wilmington;" and (d) "focused upon holding [Ledford] responsible for actions by his Democrat[ic] superiors in late 2012 and terminat[ed] him without regard [for] the very good job he was doing as a field agent in 2013."
 

 As discussed
 
 infra,
 
 DPS argues that these additional bases were insufficient to rebut the legitimate nondiscriminatory reasons it articulated to justify Ledford's termination under the second prong of the burden-shifting analysis established by
 
 Gibson.
 
 However, the issue immediately before us is whether Ledford established a
 
 prima facie
 
 case for political affiliation discrimination. Our Supreme Court has made clear that this is not an onerous burden, given that it only requires
 
 *293
 
 "proof of actions taken by the employer from which a court may infer discriminatory intent or design because experience has proven that in the absence of an explanation, it is more likely than not that the employer's actions were based upon discriminatory considerations."
 
 Gibson,
 

 308 N.C. at 138
 
 ,
 
 301 S.E.2d at 83
 
 . In summation, we conclude Gross's challenged testimony was highly probative and that, in light of the additional bases articulated in ALJ Morrison's Final Decision, its probative value was not substantially outweighed by the danger of unfair prejudice. Accordingly, we hold that ALJ Morrison did not err in admitting Gross's challenged testimony or in concluding that
 
 *68
 
 Ledford established a
 
 prima facie
 
 case for political affiliation discrimination.
 

 Burden-shifting Prong 3: Pretext
 

 DPS argues next that ALJ Morrison erred in concluding that Ledford proved the legitimate nondiscriminatory reason DPS articulated for Ledford's termination was merely a pretext for political affiliation discrimination. We disagree.
 

 Our case law makes clear that once the employee has satisfied the three elements of his
 
 prima facie
 
 case, the burden shifts to the employer to articulate some nondiscriminatory reason for taking adverse action against him.
 
 Curtis,
 

 140 N.C.App. at 481
 
 ,
 
 537 S.E.2d at 503
 
 . The employer's explanation "must be legally sufficient to support a judgment" in its favor.
 
 Gibson,
 

 308 N.C. at 139
 
 ,
 
 301 S.E.2d at 84
 
 . In addressing the employer's purported nondiscriminatory reason,
 

 [t]he trier of fact is not at liberty to review the soundness or reasonableness of an employer's business judgment when it considers whether alleged disparate treatment is a pretext for discrimination.
 

 ....
 

 While an employer's judgment or course of action may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was a pretext for illegal discrimination. The employer's stated legitimate reason must be reasonably articulated and nondiscriminatory, but does not have to be a reason that the judge or jurors would act upon or approve....
 

 * * *
 

 The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The
 
 *294
 
 more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one....
 

 Id.
 

 at 140
 
 ,
 
 301 S.E.2d at 84
 
 (citation omitted). Once the employer meets its burden of production, "the burden then shift[s] back to [the employee] to prove [the employer's] alleged reason was in fact pretextual."
 
 Curtis,
 

 140 N.C.App. at 481
 
 ,
 
 537 S.E.2d at 503
 
 . To carry this burden, it is permissible for the employee to rely on evidence offered to establish his
 
 prima facie
 
 case.
 
 Gibson,
 

 308 N.C. at 139
 
 ,
 
 301 S.E.2d at 84
 
 .
 

 In the present case, DPS argued during the OAH hearing and in its brief to this Court that it terminated Ledford for the legitimate nondiscriminatory reasons articulated in the Perry Memo. Specifically, DPS contends that Ledford improperly exploited his power as a policymaking exempt political appointee to circumvent the State Personnel Act's requirements and reassign himself; that Ledford's new position was transferred without approval from OSP back to Ledford's hometown without any legitimate business need; that the position should have been posted internally for competitive applications and the fact that it was not violated the promotional rights of the ALE Special Agents Ledford once supervised; that Ledford's salary in his new position was excessive and created an unwarranted salary inequity within ALE; and that there was no legal precedent or lawful authority to allow for Ledford's reassignment. Nevertheless, ALJ Morrison concluded that Ledford had met his ultimate burden of proving by a preponderance of the evidence that the reasons DPS articulated for his termination were merely a pretext. DPS argues this conclusion was erroneous because the only direct evidence that Ledford's termination was politically motivated came from Gross's challenged testimony and further complains that even if properly admitted, the statements by Apodaca and Shanahan, standing alone, were insufficient to rebut the legitimate nondiscriminatory reasons DPS articulated for Ledford's termination. In support of this argument, DPS relies on this Court's decision in
 
 Enoch v. Alamance Cty. Dep't of Soc. Servs.,
 

 164 N.C.App. 233
 
 ,
 
 595 S.E.2d 744
 
 (2004).
 

 In
 
 Enoch,
 
 the plaintiff was a female African American DSS employee who alleged that she had been denied a promotion on two occasions due to race-and gender-based discrimination.
 
 164 N.C.App. at 235
 
 ,
 
 595 S.E.2d at 747
 
 . In 1999, the plaintiff applied for the position of DSS program manager but was passed over in favor of a white female who did not meet the minimum qualifications for the position.
 
 Id.
 
 at 235,
 
 595 S.E.2d at 748
 
 . When the plaintiff alleged during a subsequent
 
 *69
 
 meeting with DSS's then-director, Mr. Inman, that race had played a role in his decision to hire
 
 *295
 
 the less-qualified white applicant, he replied: "You people always tend to want to believe that there's some race involved, there was no-that there's discrimination involved. There was no race involved in this decision."
 
 Id.
 
 at 236,
 
 595 S.E.2d at 748
 
 . Inman later sent a letter to the plaintiff explaining his decision in greater detail, then retired at the end of the year.
 
 See
 
 id.
 

 The plaintiff did not appeal this decision any further, and in December 2000, she was one of three applicants for a newly created program management position.
 
 See
 
 id.
 

 DSS's new director, Ms. Osborne, reviewed their applications, determined that all three applicants met the minimum qualifications, and "considered a number of factors in making her selection," including a structured interview, prior work evaluations, input from the management team and each applicant's subordinates about their interactions, consultation with human resources, and the experience and educational backgrounds of each applicant.
 

 Id.
 

 In addition, Ms. Osborne considered a list of desired qualities including "that of a visionary who is progressive and flexible."
 
 Id.
 
 at 244,
 
 595 S.E.2d at 753
 
 . In 2001, when Osborne chose a white male applicant for the promotion, the plaintiff filed a petition for a contested case hearing with OAH.
 
 Id.
 
 at 241,
 
 595 S.E.2d at 751
 
 . The ALJ assigned to the matter held a three-day hearing and ultimately determined based on 110 findings of fact and 86 conclusions of law that the decision not to promote the plaintiff was made without discrimination.
 
 See
 
 id.
 

 On appeal to this Court, the plaintiff challenged the ALJ's conclusion of law that DSS had successfully rebutted the presumption of discrimination by articulating a legitimate nondiscriminatory reason under the second prong of the
 
 Gibson
 
 burden-shifting analysis.
 
 Id.
 
 at 243,
 
 595 S.E.2d at 752
 
 . We rejected that argument, explaining that Osborne had articulated several desired qualities for the position and that there was sufficient evidence introduced during the OAH hearing that the plaintiff possessed fewer of these attributes than the other applicants.
 
 Id.
 
 at 244,
 
 595 S.E.2d at 753
 
 . The plaintiff also argued that the ALJ erred in concluding she had failed to show that DSS's purported nondiscriminatory reason for not promoting her in 2000 was merely pretextual.
 
 Id.
 
 at 245,
 
 595 S.E.2d at 753
 
 . Specifically, the plaintiff argued that the ALJ had failed to consider the racial animus evidenced in the above-quoted remark Inman made when explaining why he passed her over for a promotion in 1999.
 
 Id.
 
 at 245-46,
 
 595 S.E.2d at 754
 
 . We rejected that argument as well, explaining that the plaintiff
 

 offered no evidence linking the alleged prejudice of Mr. Inman to the decision of Ms. Osborne. Thus, ... the ALJ was correct in concluding that the evidence surrounding
 
 *296
 
 the 1999 passing over of [the plaintiff] lacked sufficient probative value for inferring pretext in Ms. Osborne's nondiscriminatory reasons for hiring [the white male applicant in 2001]. Ms. Osborne was not employed by ... DSS at the time of Mr. Inman's 1999 decision to promote [the white female applicant]; Mr. Inman was not employed by DSS at the time of Ms. Osborne's decision to promote [the white male applicant]. Furthermore, Ms. Osborne had supervised [the plaintiff] for the years of 1996-98. At no time did [the plaintiff] allege that Ms. Osborne was discriminatory in her evaluations, and these evaluations were used by Ms. Osborne in her 2001 hiring decision. Based upon the evidence before the ALJ, any inference of prejudice surrounding the 1999 promotion did not extend to Ms. Osborne's 2001 decision.
 

 Id.
 
 at 246,
 
 595 S.E.2d at 754
 
 . In the present case, DPS argues that just as Inman's purportedly discriminatory remark in 1999 was insufficient standing alone to rebut the legitimate nondiscriminatory reasons DSS articulated for its 2001 hiring decision in Enoch, Gross's challenged testimony about statements by Apodaca and Shanahan was insufficient to show that DPS's purportedly legitimate nondiscriminatory reasons for terminating Ledford four months later as articulated in the Perry Memo and during the OAH hearing were merely a pretext for political affiliation discrimination. However, this argument misconstrues our holding in
 
 Enoch.
 
 The
 
 Enoch
 
 decision was based not
 
 *70
 
 only on the fact that the statement by Inman upon which the plaintiff relied in her attempt to prove pretext was made two years before the challenged hiring decision by Osborne, but also, more significantly, because there was ample evidence in the record from the OAH hearing that demonstrated the multiple nondiscriminatory criteria on which Osborne based her decision to promote another applicant.
 
 See
 
 id.
 

 DPS's argument presupposes that here, as in
 
 Enoch,
 
 there was no other evidence apart from Gross's challenged testimony to support ALJ Morrison's conclusion that Ledford satisfied the third prong of the
 
 Gibson
 
 burden-shifting analysis. Our review of the record reveals that DPS's reliance on
 
 Enoch
 
 is misplaced.
 

 During the three-day OAH hearing herein, ALJ Morrison heard extensive testimony from Ledford and other current and former DPS and ALE officials involved in the decision to reassign him regarding the process they followed, as well as testimony from those responsible for DPS's subsequent disciplinary investigation and from Gross himself about the rationale for terminating Ledford. We reiterate here that "it is
 
 *297
 
 the prerogative and duty of [the ALJ], once all the evidence has been presented and considered, to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence."
 
 City of Rockingham,
 

 224 N.C.App. at 239
 
 ,
 
 736 S.E.2d at 771
 
 . "The credibility of witnesses and the probative value of particular testimony are for the [ALJ] to determine, and [the ALJ] may accept or reject in whole or part the testimony of any witness."
 

 Id.
 

 ALJ Morrison's Final Decision makes clear that after carefully weighing the credibility and the probative value of particular testimony, he concluded that the purportedly legitimate nondiscriminatory reasons DPS offered for Ledford's termination were not credible and, instead, were just a pretext. Given how rapidly the Perry Memo's rationales unraveled during the OAH hearing, we find ample support for ALJ Morrison's conclusion.
 

 At the OAH hearing and in its brief to this Court, DPS repeatedly emphasized the Perry Memo's conclusion that Ledford reassigned himself. While this allegation certainly makes for an incriminating sound bite, we find it highly misleading, given that the evidence in the record tends to show that Ledford was minimally involved in the decision-making process after he raised his reassignment request with Secretary Young, who testified that he approved the request after consultation with other DPS and ALE officials including Gross, Senter, and Ragdale. The only specific evidence to the contrary that Perry could offer when he testified was that Ledford had made the request himself and also signed his PAC Form on the line designated for the Director of ALE. However, Ledford explained during his testimony that it was his regular duty to sign ALE employee PAC Forms in order to verify that their most recent performance evaluations were consistent with the actions recommended, and that he signed his own PAC Form to ensure that every individual who needed to review the propriety of his requested reassignment had the opportunity to do so. Although the Perry Memo alleges that by signing his own PAC Form, Ledford "sen [t] a clear message that neither [HR] nor Fiscal had any real authority to deny [his] request" and thus effectively exploited his position to intimidate others into complying with his wishes, DPS presented no evidence during the OAH hearing to support this allegation. Indeed, those involved in the process of approving Ledford's reassignment testified to the contrary, while Murga, Dugdale, and Perry himself acknowledged that they made no efforts whatsoever to contact any of those individuals during their investigation-despite the fact that at least two of them, Page and Senter, continued to work for ALE and presumably could have shed at least some light on the internal process that led to Ledford's reassignment. This lack of communication
 
 *298
 
 may very well explain why nobody involved in DPS's investigation knew that there had indeed been a legitimate reason to move Ledford's new position to Asheville, or that Cobb had approved Ledford's reassignment on behalf of OSP in 2012, or that Gross had taken on an expanded role in the Division's chain of command.
 
 *71
 
 DPS also contended that Ledford's salary in his new position was excessive and created a division-wide inequity. While there is some evidence that Gross was mistaken in his belief that Section 4, Page 29 of the State Human Resources Manual
 
 required
 
 Ledford's salary to be set at the maximum rate available, the plain language of this policy clearly establishes that Ledford's salary was in the legally permissible range. Moreover, Shanahan determined that the allegations of a division-wide salary inequity in the two grievances filed against Ledford were non-grievable issues, and DPS points to no evidence that Gross was mistaken when he testified that "in order for there to be a grievable inequity, there has to be more than $10,000 between the person who is at top pay and the next person below him," which was not the case here.
 

 In addition, DPS highlighted the Perry Memo's determination that there was no legitimate business reason to relocate Ledford's new position from Wilmington to Asheville or to reclassify it from Contributing-level to Advanced-level. However, testimony introduced during the OAH hearing from Gross, Senter, Page, and Ragdale regarding the 2010 assessment that found a need for an additional Special Agent in Asheville flatly contradicts this assertion, as does evidence that even after Ledford's termination, an additional Special Agent remained in Asheville despite the Perry Memo's statement that the position would be moved back to Wilmington.
 

 DPS also insisted that Ledford's new position should have been posted internally for competitive applications, based on testimony from Murga, Dugdale, and others who did not believe the exception to the general posting requirement Gross had identified from Section 2, Page 21 of the State Personnel Manual applied to Ledford.
 
 [9]
 
 But such a determination does not necessarily support DPS's claim that Ledford's
 
 *299
 
 reassignment violated the promotional rights of other ALE agents, especially in light of the fact Shanahan rejected both grievances filed against Ledford based in part on his determination that ALE "does not afford employees a right to file a grievance for failing to post a vacant position" and that the Special Agents who complained that Ledford's reassignment without posting violated their promotional rights had not raised grievable issues because they could not show that the failure to post "arguably resulted in [each grievant's] being denied a promotion." Indeed, in light of Ledford's decades of experience, thousands of hours of advanced training, and demonstrated loyalty to ALE, we find it hard to imagine how an applicant could be more qualified to serve as an Advanced-level Special Agent, and despite its repeated claims that there was no legal precedent or lawful authority to allow for Ledford's reassignment, DPS has failed to identify any law or regulation that might expressly prohibit it. Moreover, although Section 2, Page 21 of the State Personnel Manual does not purport to provide an exclusive list of exceptions from the general posting requirement, even assuming
 
 arguendo
 
 the position should have been posted, Davis-Gore reviewed Murga's investigation and concluded that DPS had "two viable options" for handling this situation
 
 *72
 
 -namely, doing nothing or affording Ledford the opportunity to transfer with the position to Wilmington. Terminating Ledford was not among the options.
 

 DPS complains that ALJ Morrison erred in identifying Perry's failure to follow Davis-Gore's recommendations as an additional basis to support his conclusion that the legitimate nondiscriminatory reason for terminating Ledford was merely a pretext. In DPS's view, this was wholly irrelevant and DPS raises similar objections to ALJ Morrison's focus in his Final Decision on the fact that, contrary to ALE's internal disciplinary procedure, Ledford was never provided any notice of the charges against him or any opportunity to respond, as well as the fact that neither Murga nor Dugdale nor Perry ever made any attempt to consult anyone involved in the decision-making process that resulted in
 
 *300
 
 Ledford's reassignment. DPS contends that the Final Decision's findings and conclusions on these points "merely serve[ ] to illustrate the ALJ's misunderstanding that as a non-career State employee, Ledford could be dismissed for any reason or no reason at all, just not an illegal reason." DPS is correct that once he returned to the field, Ledford was a probationary employee and had no right to the protections provided under the State Personnel Act. In our view, however, when combined with the aforementioned flaws in its stated rationale for terminating Ledford-many of which seem to have resulted from DPS's failure to consult anyone involved in the reassignment-these decisions not to afford Ledford the same procedural rights it customarily extended to all ALE employees, and not to follow the "two viable options" recommended by its top personnel officer, strongly suggest both that DPS was looking for any reason it could find to terminate Ledford and that the purportedly legitimate nondiscriminatory reasons it articulated during the OAH hearing were merely a pretext. As noted
 
 supra,
 
 "[t]he reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose it as a pretext, if indeed it is one."
 
 Gibson,
 

 308 N.C. at 140
 
 ,
 
 301 S.E.2d at 84
 
 .
 

 During an OAH hearing, it is the ALJ's duty to determine the weight and sufficiency of the evidence and the credibility of the witnesses, whose testimony the ALJ may accept or reject in whole or in part, as well as the inferences to be drawn from the facts.
 
 City of Rockingham,
 

 224 N.C.App. at 239
 
 ,
 
 736 S.E.2d at 771
 
 . In the present case, we find strong support in the record for ALJ Morrison's conclusion that Ledford proved by a preponderance of the evidence that his termination was the result of political affiliation discrimination.
 

 In its final argument, DPS warns in dire tones against the public policy ramifications of allowing ALJ Morrison's Final Decision to stand. Specifically, DPS cautions this Court that our decision in this case might open the proverbial floodgates to allow future administrations of both parties to frustrate our State's democratic ideals by entrenching partisan appointees before relinquishing power. Legal scholars have long recognized the potentially deleterious effects of such practices in other arenas.
 
 See, e.g.,
 
 Jack M. Balkin & Sanford Levinson,
 
 The Processes of Constitutional Change: From Partisan Entrenchment to the National Surveillance State,
 

 75 Fordham L. Rev. 489
 
 (2006) (analyzing the impact on our federal judiciary). While acts of old school political patronage that turn the highest levels of State government into a revolving door through which well-connected acquaintances of those in power can gain
 
 *301
 
 prestige and lucrative remuneration at the taxpayers' collective expense are perhaps more publicized, on an abstract level the prospect of the old guard embedding itself bureaucratically on its way out the door in order to stall its successors' progress strikes us as potentially being every bit as corrosive to the goal of representative self-governance. Nevertheless, on a practical level, we find it difficult to discern how this rationale applies in the case of a veteran law enforcement officer who has dedicated his entire career to serving and protecting the people of this State, wishes to continue doing so in a role that has no clear impact on effectuating either party's policy priorities, and, unlike more common stereotypical well-heeled political appointees, has no proverbial golden parachute
 
 *73
 
 to guarantee a comfortable landing in the private sector. If our General Assembly is truly concerned with protecting North Carolinians against such harms as DPS forewarns, it can take appropriate legislative action, but this Court declines DPS's invitation to turn Ledford into a scapegoat for all that ails our body politic.
 

 For these reasons, ALJ Morrison's Final Decision is
 

 AFFIRMED.
 

 Judges STROUD and INMAN concur.
 

 [1]
 

 ALE's Deputy Director of Operations, Richard Allen Page, had also previously worked in the Asheville office and made a similar reassignment request in late 2012 which followed a similar approval procedure to the process discussed
 
 infra
 
 for Ledford's request. Page was ultimately reassigned to serve as the Special Agent in Charge ("SAC") of ALE's Asheville office, where he served as Ledford's supervisor until April 2013.
 

 [2]
 

 The other two exempt DPS employees moved to non-exempt positions were Page and the former Director of Prisons. There is no indication in the record before us that either was investigated or disciplined as a result of their reassignments.
 

 [3]
 

 As detailed
 
 infra,
 
 the version of the Perry Memo that Ledford received was dated 9 April 2010 and had not been signed by Perry. However, it became clear during the subsequent OAH hearing that Perry had signed a different version of the memo dated 10 April 2013, which DPS considered the official copy. Ledford's counsel cross-examined Perry extensively on the differences between these two versions, which were stylistic, rather than substantive.
 

 [4]
 

 Ledford's petition was timely filed before our General Assembly's repeal of section 126-34.1 became effective on 21 August 2013.
 

 [5]
 

 For example, Murga reported to Dugdale that she did not know why Gross had signed off on Ledford's PAC Form instead of Chief Deputy Secretary Rudy Rudisell, who she believed should have signed the form instead. However, during the OAH hearing, Ledford and Gross both testified that Rudisill had been removed from the chain of command within ALE, leaving Gross to fill in and report directly to Secretary Young. When Murga testified, she admitted she had not spoken to anyone involved in the decision-making process for Ledford's reassignment and was consequently unaware that Gross had assumed Rudisill's responsibilities. Murga agreed that in light of this news, it was appropriate for Gross to have signed off on Ledford's PAC Form and thus conceded that her answer to Dugdale's question had been erroneous.
 

 [6]
 

 ALJ Morrison also noted in his factual findings that DPS "failed to produce discovery in a timely manner. Some was produced on the evening of the last business day before hearing and during the hearing. This was prejudicial to [Ledford] as it required his counsel to spend excessive amounts of time seeking production of the discovery and affected [Ledford's] ability to conduct follow-up discovery and adequately prepare the case." We note here that the last business day before the hearing was the day before Thanksgiving, and that after 6:00 that evening, DPS sent Ledford's counsel an email with numerous attachments that included,
 
 inter alia,
 
 the memorandum Dugdale wrote to Perry informing him of the "two viable options" Davis-Gore provided for resolving the situation and other documents that had never previously been provided. We also note, however, that it appears from the OAH transcript these delays in discovery were not the fault of DPS's counsel, who appears to have conducted himself admirably under the circumstances given that, as he explained to ALJ Morrison, he, too, was without access to these documents until he received them from DPS on the last business day before the OAH hearing, when he was the only person left in his office and had to successfully navigate technological setbacks in order to scan, download, and email them to Ledford's counsel.
 

 [7]
 

 We note here that DPS does not challenge whether Ledford met the second required element of his
 
 prima facie
 
 case. Because the record includes substantial evidence of Ledford's affiliation with the Democratic party,
 
 see
 

 Curtis,
 

 140 N.C.App. at 479
 
 ,
 
 537 S.E.2d at 502
 
 , we conclude that Ledford did satisfy this element.
 

 [8]
 

 The challenged testimony also is highly probative of another element necessary to Ledford's claim, discussed
 
 infra,
 
 that the purportedly nondiscriminatory reason articulated by DPS for his termination was pretextual.
 

 [9]
 

 The relevant subsection here is labeled "Posting Requirements Not Applicable" and provides that: "Posting is not required when an agency determines that it will not openly recruit. The decision shall be based upon a
 
 bona fide
 
 business need and is the responsibility of the agency head. Examples include vacancies which are: committed to a budget reduction; used to avoid a reduction in force; used to effect a disciplinary transfer or demotion; to be filled by transfer of an employee to avoid the threat of bodily harm; to be filled immediately to prevent work stoppage in constant demand situations, or to protect public health, safety or security; designated exempt policymaking [G.S. 126-5(d) ]; to be filled by chief deputies and chief administrative assistants to elected or appointed agency heads[,] and vacancies for positions to be filled by confidential assistants and confidential secretaries to elected or appointed agency heads, chief deputies, or chief administrative assistants; to be filled by an eligible exempt employee who has been removed from an exempt position and is being placed back in a position subject to all provisions of the State Personnel Act; to be filled by a legally binding settlement agreement; to be filled in accordance with a formal, pre-existing written agency workforce plan, including lateral appointments resulting from the successful completion of the requirements for the Model Co-op Education Program, the In-Roads Program or the Governor's Public Management Fellowship Program; to be filled immediately because of a widespread outbreak of a serious communicable disease, and; to be filled as a result of a redeployment assignment."