**CITY OF ROCKINGHAM v. N.C. DEP'T OF ENV'T & NATURAL RES.**

[224 N.C. App. 228 (2012)]

CITY OF ROCKINGHAM, NORTH CAROLINA AND AMERICAN RIVERS, PETITIONERS
v.
NORTH CAROLINA DEPARTMENT OF ENVIRONMENT AND NATURAL
RESOURCES, DIVISION OF WATER QUALITY, AND NORTH CAROLINA
ENVIRONMENTAL MANAGEMENT COMMISSION, RESPONDENTS
AND
PROGRESS ENERGY CAROLINAS, INC., RESPONDENT-INTERVENOR

No. COA12-763

Filed 18 December 2012

**1. Administrative Law—judicial review of agency decision—standard of review**

Even though the trial court may have applied a *de novo* standard to an issue that should be reviewed under the whole record test, the trial court's review was not improper since *de novo* review was more beneficial for petitioners and the trial court still upheld respondent Environmental Management Commission's decision.

**2. Environmental Law—hydroelectric power-generating facility—biological integrity**

The trial court did not err in a case concerning the operation of a hydroelectric power-generating facility by affirming the final agency decision of respondent Environmental Management Commission because the whole record showed that the ALJ considered the biological integrity of the aquatic life and properly concluded that the certified flow rate would maintain and not degrade the aquatic life.

**3. Environmental Law—hydroelectric power-generating facility—no practical alternatives**

The trial court did not err in a case concerning the operation of a hydroelectric power-generating facility by affirming the final agency decision of respondent Environmental Management Commission because there was substantial evidence that no practical alternatives were available when retrofitting was offered as a hypothetical by an expert who had never visited the dam and would provide relatively little additional improvement in biological integrity.

**4. Environmental Law—hydroelectric power-generating facility—minimizing adverse impacts—Clean Water Act**

The trial court did not err in a case concerning the operation of a hydroelectric power-generating facility by affirming the final

agency decision of respondent Environmental Management Commission because there was substantial evidence that aquatic life would not be adversely impacted by the Section 401 certification under the Clean Water Act.

**5. Environmental Law—hydroelectric power-generating facility— exemption from mitigation requirements—Clean Water Act**

The trial court did not err in a case concerning the operation of a hydroelectric power-generating facility by concluding that a discharge of water was not regulated by the Clean Water Act and that this project was exempt from mitigation requirements because existing uses would not be removed or degraded by the Clean Water Act Section 401 certification.

**6. Environmental Law—hydroelectric power-generating facility— land preservation as mitigation—mootness**

Although petitioners argued in the alternative that the trial court erred by not evaluating whether the land preservation plan was sufficient mitigation and that respondent Environmental Management Commission (EMC) erred in upholding a land preservation plan that did not comply with EMC's rules, this argument was moot given the Court of Appeals' interpretation that mitigation was unnecessary.

Appeal by Petitioners from order entered 12 January 2012 by Judge Dennis J. Winner in Richmond County Superior Court. Heard in the Court of Appeals 14 November 2012.

*Southern Environmental Law Center, by Amelia Y. Burnette and Julia F. Youngman, and Pro Hac Vice, Water & Power Law Group PC, by Richard Roos-Collins, for Petitioners-Appellants.*

*Attorney General Roy Cooper, by Special Deputy Attorney General Francis W. Crawley and Assistant Attorney General Donald W. Laton, for Respondents-Appellees.*

*Hunton & Williams LLP, by William D. Dannelly and Matthew F. Hanchey, and Daniel W. Kemp, Associate General Counsels for Progress Energy Service Company, LLC, for Respondent-Intervenor-Appellee.*

BEASLEY, Judge.

The City of Rockingham and American Rivers (Petitioners) appeal from an order affirming the final agency decision of Respondent Environmental Management Commission (EMC). For the reasons stated herein, we affirm.

## I. Facts

Progress Energy Carolinas (Intervenor) operates a hydroelectric power-generating facility at the Tillery Dam on the Yadkin-Pee-Dee River. The Tillery Dam was constructed in the early 1900s. The Federal Energy Regulatory Commission (FERC) issued the license for this facility on 19 May 1958. This fifty-year license expired on 30 April 2008, and FERC has issued annual licenses to Intervenor to continue operations on the same terms as the 1958 license. Intervenor began the relicensing process in 2003 using a collaborative approach. Intervenor solicited information and comments from several state and federal agencies as well as other groups as "stakeholders." The Division of Water Resources (DWR), Respondent Division of Water Quality (DWQ), Wildlife Resources Commission (WRC), and Petitioners participated in the stakeholder process. DWR and DWQ are divisions of Respondent North Carolina Department of Environment and Natural Resources (NCDENR).

Intervenor submitted its final application for a new license to FERC on 25 April 2006. On 30 July 2007, Intervenor submitted a proposed Comprehensive Settlement Agreement (CSA) for the Yadkin-Pee-Dee River Project to FERC. Petitioner American Rivers originally signed the CSA but later withdrew its support. Petitioner City of Rockingham never signed the CSA. The CSA proposed a minimum flow rate of 330 cubic feet of water per second (cfs). The minimum flow rate would increase to 725 cfs for an eight-week period beginning in mid-March for the American shad spawning season. The minimum flow rate under the original license is 40 cfs.

Section 401(a)(1) of the Clean Water Act (CWA) requires that a state certify that a discharge subject to federal licensing will comply with all applicable water quality standards. 33 U.S.C. § 1341(a)(1) (2006). Intervenor submitted its Section 401 Application to DWQ on 11 May 2007. The application incorporated the CSA and FERC application. DWQ solicited public comment on the application, and Petitioners submitted comments.

DWQ issued the initial Section 401 Certification (Certification) on 11 February 2008. DWQ later amended the Certification to add addi-

CITY OF ROCKINGHAM v. N.C. DEP'T OF ENV'T & NATURAL RES.

[224 N.C. App. 228 (2012)]

tional conditions but essentially maintained the 330/725 cfs minimum flow rate.

Petitioners filed a Petition for a Contested Case Hearing on 11 April 2008 and amended the Petition on 24 October 2008. Intervenor filed a Motion to Intervene on 22 May 2008. The motion was granted on 1 July 2008. The Administrative Law Judge (ALJ) upheld the Certification on 23 March 2011. EMC[1] issued the final agency decision on 22 July 2011 adopting the ALJ's findings and conclusions. Petitioners filed a Petition for Judicial Review of Final Agency Decision on 18 August 2011. The Richmond County Superior Court judge affirmed EMC's decision on 30 December 2011 and filed an order to that effect on 12 January 2012. The trial court did not specify which standard of review it applied since it opined that the result under either standard was the same for all issues in this case. Petitioners filed their notice of appeal on 10 February 2012. Additional facts and findings are developed below as necessary to resolve Petitioners' appeal.

## II. Standard of Review

[1] In reviewing the agency's decision, the Superior Court may reverse or modify the decision if it finds that the decision is

(1) In violation of constitutional provisions;

(2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or

(6) Arbitrary, capricious, or an abuse of discretion.

N.C. Gen. Stat. § 150B-51(b) (2011). An appellate court's review proceeds in two steps: (1) examining whether the trial court applied the correct standard of review and (2) whether the trial court's review was proper. *Holly Ridge Assocs., LLC v. N.C. Dep't of Env't & Natural Res.*, 361 N.C. 531, 535, 648 S.E.2d 830, 834 (2007).

---

1. EMC administers the State's authority under the CWA. N.C. Gen. Stat. § 143B-282(a)(1)(u) (2011).

When the appellant challenges the agency's decision under § 150B-51(b)(1)-(4), the standard of review is *de novo*. *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 659, 599 S.E.2d 888, 895 (2004). The trial court may substitute its own judgment for that of the agency under *de novo* review. *Id.* at 660, 599 S.E.2d at 895. As a general matter, an agency's interpretation is entitled to some deference. *See Britt v. N.C. Sheriffs' Educ. & Training Standards Comm'n*, 348 N.C. 573, 576, 501 S.E.2d 75, 77 (1998)("[T]he interpretation of a regulation by an agency created to administer that regulation is traditionally accorded some deference by appellate courts.").

The standard of review is the whole record test for a challenge under § 150B-51(b)(5)-(6). *Carroll*, 358 N.C. at 659, 599 S.E.2d at 895. "The 'whole record' test does not allow the reviewing court to replace the [agency's] judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it *de novo*." *Thompson v. Wake Cty Bd. of Ed.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977). The court's task is to determine whether substantial evidence supports the agency's decision after considering the evidence that tends to detract from the decision and the evidence that tends to support decision. *Carroll*, 358 N.C. at 660, 599 S.E.2d at 895; *Thompson*, 292 N.C. at 410, 233 S.E.2d at 541. " 'Substantial evidence' means relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C. Gen. Stat. § 150B-2(8c) (2011).

Since the trial court did not specify the standard of review for each issue and merely opined that the result was the same regardless, the trial court essentially reviewed all issues *de novo* but nonetheless upheld EMC's decision. Even though the trial court may have applied a *de novo* standard to an issue that should be reviewed under the whole record test, the trial court's review was not improper since *de novo* review is more beneficial for Petitioners and the trial court still upheld EMC's decision.[2] We have applied the standard of review applicable to each of Petitioners' issues and affirm the trial court's order.

### III. Biological Integrity

[2] First, Petitioners argue that EMC[3] failed to assess whether biological integrity is "attained" and assert that the record as a whole

---

2. The better practice, of course, is for the trial court to specifically note the standard of review applied to each issue.

3. The ALJ's decision is essentially EMC's decision since it was adopted in full by EMC, so there is no difference in referring to the decision as the ALJ's decision or EMC's decision.

shows that the minimum flow rate will not "attain" biological integrity. For Petitioners' first argument on this issue, the standard of review is *de novo*. Petitioners' second argument on this issue is reviewed under the whole record test. We reject both arguments.

Rule 506 of Title 15A, Subchapter 2H sets forth the requirements for the Director of DWQ to issue a certification.

> (b) The Director shall issue a certification upon determining that existing uses are not removed or degraded by a discharge to classified surface waters for an activity which:
> (1) has no practical alternative under the criteria outlined in Paragraph (f) of this Rule;
> (2) will minimize adverse impacts to the surface waters based on consideration of existing topography, vegetation, fish and wildlife resources, and hydrological conditions under the criteria outlined in Paragraph (g) of this Rule; . . .
> [and]
> (6) provides for replacement of existing uses through mitigation as described at Subparagraphs (h)(1) of this Rule.

15A N.C. Admin. Code 2H.0506(b) (2012).

"Biological integrity means the ability of an aquatic ecosystem to support and maintain a balanced and indigenous community of organisms having species composition, diversity, population densities and functional organization similar to that of reference conditions." 15A N.C. Admin Code 2B.0202(11) (2012). Reference conditions are not defined in the Code. As a Class B surface water, Tillery Reach must meet both the Class B and Class C requirements. *See* 15A N.C. Admin. Code 2B.0219 (2012). Class C surface waters "shall be suitable for aquatic life propagation and maintenance of biological integrity, wildlife, secondary recreation, and agriculture." 15A N.C. Admin. Code 2B.0211(2)(2012).

The heart of Petitioners' argument is that the reference condition for measuring the biological integrity of the Tillery Reach is its original condition prior to the construction of the dam. Though Petitioners and Intervenor disagree about the use of the term "attain," the disagreement is irrelevant since the record shows that the ALJ compared the effects of the Certification with " '[p]re-project natural'

conditions." The ALJ's findings demonstrate a comparison of the effects of the Certification and the "habitat that would be available to aquatic organisms if the Tillery Dam was not present, and flows were unaltered by the hydro project operations." Since the ALJ engaged in the comparison advanced by Petitioners, there is no legal error.

As to Petitioners' argument that the whole record shows that biological integrity will not be attained, there is substantial evidence in the record supporting the conclusion that biological integrity would be maintained and not degraded. The trial court's order, incorporating the ALJ's decision, noted that findings of fact 80 through 158 and conclusions of law 12 through 19 considered the biological diversity in the Tillery Reach. The evidence Petitioners point to regarding the depressed mussel population refers to the current state of the population under the current flow rate rather than any effect the Certification would have. The ALJ considered the evidence on both sides, including some evidence that the higher flow rate proposed by Petitioners would benefit some species living in the Tillery Reach. However, the ALJ found, considering all the evidence, little difference between the certified flow rate and the flow rate proposed by Petitioners. The ALJ concluded that the "water flows allowed under the Amended 401 Certification would enhance, and not impair or remove aquatic life habitat and, therefore, improve opportunities for aquatic life." The whole record shows that ALJ considered the biological integrity of the aquatic life and properly concluded that the certified flow rate would maintain and not degrade the aquatic life.

## IV. Practical Alternatives

[3] Second, Petitioners disagree with the trial court's interpretation of how the agency should determine whether an activity "has no practical alternative" and claim that EMC did not evaluate the alternatives and assess the impacts on recreation and aquatic life. The standard of review is *de novo* for the former argument and the whole record test for the latter argument. We disagree with both arguments.

Intervenor argues that a finding that an activity has no practical alternative is not required in this case since the ALJ found that the activity did not remove or degrade existing uses. Petitioners' reply brief argues that this is an improper cross-appeal. Petitioners' assertion is moot given our resolution of their substantive argument below.

The ALJ found that there was an absence of a practical alternative. The trial court stated that the agency considered the alterna-

tives, as shown in findings of fact 58 and 59, and concluded that the minimum flow adopted by DWQ was "the only practical one." The trial court found that the evidence was sufficient to support this conclusion. The trial court also concluded that "there is nothing in the law finding that [the agency] must find all alternatives impractical but, rather it is the duty of the Department, under the law, to consider alternatives and to determine that the alternative which they choose [sic] is practical." It is this final conclusion that Petitioners argue is legal error.

The ALJ's conclusion and trial court's conclusion that there are no practical alternatives track Rule 506(b)'s language and do not rely on the trial court's interpretation that the agency need not find each alternative impractical. Any legal error in the interpretation of how the agency should determine whether an activity "has no practical alternative" is harmless since it did not form the basis for the agency's and trial court's decisions and therefore would not change the outcome.

Petitioners point to two alternatives that they claim EMC did not evaluate: the higher minimum flow rate Petitioners proposed and retrofitting the dam.

> A lack of practical alternatives may be shown by demonstrating that, considering the potential for a reduction in size, configuration or density of the proposed activity and all alternative designs the basic project purpose cannot be practically accomplished in a manner which would avoid or result in less adverse impact to surface waters or wetlands.

15A N.C. Admin. Code 2H.0506(f).

As to the proposed higher minimum flow rate, Intervenor argues that the higher minimum flow rate is not an "alternative" under the Rules. Regardless, the ALJ considered it as an alternative.

Mr. Dorney, the Wetland Program Development Unit Supervisor for DWQ, testified that he and Intervenor agreed that a higher minimum flow rate was not economically practical based on the information Intervenor provided. Mr. Dorney stated that the practicality assessment is "a weighing of cost versus benefit, cost in terms of what it would cost the applicant to provide more environmental protection as opposed to the benefit achieved from that environmental protection. And the basic question is what is economically practical

in terms of the amount of impact." The evidence showed that an increased minimum flow rate would cost Intervenor about $700,000 per year because Intervenor would not be able to generate as much energy. It was the agency's conclusion that a higher minimum flow rate was not practical given the additional operating loss of $700,000. Combined with the evidence that a higher minimum flow rate had little additional positive impact on biological integrity, there is substantial evidence supporting the ALJ's conclusion that there was no practical alternative to the Certification.

Petitioners also point to the alternative of retrofitting the dam. Intervenor concedes that there are no specific findings or mention of retrofitting the dam as an alternative. Nonetheless, there was evidence before the agency regarding the proposed retrofitting of the dam. Petitioners argue that this evidence was "[u]nrebutted expert testimony" that a hypothetical retrofit could recoup its costs within six years. However, examination of the record shows that this testimony was not entirely unrebutted. Dr. Michael Sale testified to cost/benefit analysis for retrofitting the dam. Dr. Sale had not visited the Tillery Reach Dam. Dr. Sale also admitted that he had not accounted for a wide variety of potential costs, including the cost of shutting down Intervenor's power plants to retrofit the dam. Further, Petitioners' counsel stated that he offered this evidence only to show that the calculations were possible and not as a fact that the retrofit could be paid off within six years. Considering Mr. Dorney's testimony regarding the agency's practicality assessment, there is substantial evidence that no practical alternatives were available when the retrofitting was offered as a hypothetical by an expert who had never visited the Tillery Dam and would provide relatively little additional improvement in biological integrity compared with the Certification despite a capital investment that may or may not pay for itself in six years' time.

## V. Minimizing Adverse Impacts

[4] Next, Petitioners argue that EMC erroneously interpreted Rule 506(b)(2) regarding adverse impacts and that the whole record demonstrates that the Certification will not minimize adverse impacts on primary and secondary recreation and aquatic life. We disagree. The former argument receives *de novo* review and the latter argument receives whole record review.

Petitioners argue that minimization of adverse impacts requires more than an incremental improvement or maintenance of the status quo from the issuance of the original license. Rule 506(b)(2) states that the Director must find that the activity "will minimize adverse impacts to the surface waters based on consideration of existing topography, vegetation, fish and wildlife resources, and hydrological conditions under the criteria outlined in Paragraph (g) of this Rule." Paragraph (g) states that "[m]inimization of impacts may be demonstrated by showing that the surface waters or wetlands are able to continue to support the existing uses after project completion." 15A N.C. Admin. Code 2H.0506(g).

These rules require some degree of comparison, and Petitioners, Respondent, and Intervenor disagree regarding what time period is used as the baseline. Though Petitioners are correct that the definition of "existing uses" in 15A N.C. Admin. Code 2B.0202(30) does *not* confine itself to uses that were attainable only after 1975, neither does it require looking to the condition and uses of the surface water prior to the installation of the dam at issue. Petitioners argue that not looking to the pre-dam state of the waters is absurd in holding Intervenor to an arguably lesser standard because the dam was licensed prior to the CWA, but it is more absurd to read this statute to require the agency to compare the water quality to the state it was in the early 1900s prior to the dam's construction. Subparagraph (g) states that minimization *may* be shown by comparing the pre-project uses with the uses that will be available after completion of the project. This comparison is permissive, and such a comparison makes little sense in this case since the project, i.e., the dam, was completed in the early 1900s. The logical reading of these rules is that the certified activity must minimize the adverse impacts it may have, for example, by continuing to support the existing uses, but not necessarily by a comparison to the pre-dam condition of the waters. The ALJ's interpretation of this provision is entitled to some deference and is not erroneous. *See Britt*, 348 N.C. at 576, 501 S.E.2d at 77.

As to Petitioners' argument that the whole record shows that adverse impacts on primary recreation will not be minimized, Petitioners fail to cite any contrary evidence in the record showing that the Certification will adversely affect the primary recreation in the area, which is defined as swimming or body contact with water, 15A N.C. Admin. Code 2B.0202(52). Essentially, what Petitioners cite in the record is evidence that the primary recreation in the area was already minimal under the current flow rate. Petitioners do not

respond to or attempt to contradict finding of fact 69 that "[a]ll parties agreed that the increased 330/725 cfs minimum flows . . . would improve recreational conditions."

As to Petitioners' argument that the whole record shows that adverse impacts on secondary recreation will not be minimized, Petitioners fail to cite any contrary evidence in the record showing that the Certification will adversely affect the secondary recreation in the area, which is defined as boating and activities requiring infrequent body contact with the water, 15A N.C. Admin. Code 2B.0202(57). Again, what Petitioners argue and cite in the record is that a higher minimum flow rate would be better than the Certification for secondary recreation. The requirement to minimize adverse impacts, however, does not require that the Certification further enhance secondary recreation if it has been determined that the Certification will not adversely impact the existing secondary recreation uses. Again, Petitioners do not respond to or attempt to contradict finding of fact 69 that "[a]ll parties agreed that the increased 330/725 cfs minimum flows . . . would improve recreational conditions." Though Petitioners point out that the City of Rockingham would benefit from increased eco-tourism on the Tillery Reach and that another river in South Carolina is more frequently used for secondary recreation activities, despite being shorter and less attractive than the Tillery Reach, those are not factors in issuing the Certification.

As to Petitioners' argument that the whole record shows that adverse impacts on aquatic life will not be minimized, this argument is similar to their argument above regarding attainment of biological integrity and can be refuted on similar grounds. The ALJ compared the effects of the Certification with the pre-dam habitat for the aquatic life in the area and found that aquatic life would be improved under the Certification.

Different from their attainment of biological integrity argument, however, they argue that Index C was not a valid scientific method to assess the effects of the Certification because the Tillery Reach does not have a constant flow rate. Mr. Mead from DWR testified that the Certification would have a positive impact on fifteen out of twenty-three species in the Tillery Reach based on calculations using Index C. Petitioners admitted in their Memorandum of Fact and Law in Support of Exceptions to the Administrative Law Judge's Recommended Decision that Weighted Usable Area (WUA), employed by FERC, is a valid methodology in this case. They contended, though,

that the WUA results were misrepresented. FERC concluded that there was little additional benefit gained from Petitioners' proposed flows using WUA.

> In an administrative proceeding, it is the prerogative and duty of that administrative body, once all the evidence has been presented and considered, "to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence. The credibility of witnesses and the probative value of particular testimony are for the administrative body to determine, and it may accept or reject in whole or part the testimony of any witness."

*Little v. N.C. State Bd. of Dental Exam'rs*, 64 N.C. App. 67, 68-69, 306 S.E.2d 534, 536 (1983)(quoting *Comm'r. of Insurance v. Rate Bureau*, 300 N.C. 381, 406, 269 S.E.2d 547, 565 (1980)) (citations omitted).

Here, the evidence that Index C may have been an imperfect method goes toward the weight of the evidence, and the ALJ was within her province to give the testimony of Mr. Mead greater weight. Petitioners accepted the validity of WUA, though arguing that the results were misrepresented. FERC's conclusions were also before the agency in addition to DWR's conclusions using Index C; thus, there was substantial evidence that aquatic life would not be adversely impacted by the Certification.

## VI. Mitigation

[5] Petitioners argue that the trial court erred in concluding that a discharge of water is not regulated by the CWA and that this project was exempt from mitigation requirements. We reject both arguments under *de novo* review.

The ALJ concluded that mitigation was unnecessary given that all parties agreed that recreation and aquatic life would be improved by the Certification. The trial court likewise concluded

> as a matter of law that mitigation is only required when "existing uses are removed or degraded by a discharge to classified surface water". [sic] There has been no evidence brought forth by Peti-tioners to show that existing uses were removed or that anything was degraded by the increase of the minimum water flow from the dams and that there is no evidence of any discharge by anyone to classified surface waters.

Here, none of the parties ever contested the need for certification to discharge water from the dam. The trial court appears to be confused about what "discharge" means in the context of the CWA. The release of water from the dam is a discharge covered by the CWA that requires certification by the State. *See* 33 U.S.C. § 1341(a)(1). Though the trial court committed error in making this statement, it was only one of two reasons for its ultimate conclusion that mitigation was unnecessary. The trial court concluded, as the ALJ did, that mitigation is unnecessary in this case since existing uses were not removed or degraded. The trial court's error in stating that there was no evidence of any discharge is harmless since we find that this interpretation is reasonable and supported by the evidence that no existing uses are degraded or removed.

In arguing that the trial court erred in concluding that this project was exempt from mitigation requirements, Petitioners again rely on their reading of minimization of adverse impacts and that the baseline for the comparison is the status of the Tillery Reach prior to constructing the dam.

Intervenor argues that the ALJ and trial court properly concluded that mitigation is not required in this case. Intervenor argues that paragraph (b) of Rule 506 should be read like paragraph (c) of Rule 506 regarding wetlands. When it is determined that the certification "would not remove or degrade existing uses," review is limited to the criteria in subparagraph (c)(2)-(5), eliminating the necessity of reviewing the criteria in subparagraph (c)(1) and (c)(6). 15A N.C. Admin. 2H.0506(a). The criteria in subparagraph (c)(1)-(6) are similar to the criteria in subparagraph (b)(1)-(6), but paragraph (a) does not limit the criteria to be reviewed for surface waters under paragraph (b).

Though there is some tension within Rule 506 in that it does not necessarily limit the review under paragraph (b) to the criteria in subparagraphs (2)-(5), a logical reading of these provisions comports with the ALJ's decision and the trial court's decision that mitigation is unnecessary where it is shown that existing uses will not be degraded or removed by the Certification. It would be impossible for the Director to issue a certification if the agency must evaluate the replacement of existing uses when the agency has already determined that no existing uses will be lost or degraded, meaning they do not need replacing since they have not been lost in the first place. Additionally, the agency's interpretation is to be accorded some deference. *See Britt*, 348 N.C. at 576, 501 S.E.2d at 77. We find no legal error in the ALJ's and trial court's interpretation of this Rule.

VII.  Land Preservation as Mitigation

**[6]** Finally, Petitioners argue in the alternative that the trial court erred in not evaluating whether the land preservation plan was sufficient mitigation and that EMC erred in upholding a land preservation plan that does not comply with EMC's rules. Petitioners' argument is moot given our interpretation that mitigation is unnecessary when the agency has determined that existing uses will not be removed or degraded by the Certification.

For the reasons stated above, we affirm the trial court's decision upholding EMC's final decision.

Affirmed.

Judges ELMORE and STROUD concur.