DAVIS, Judge.
Marilyn R. Brewington ("Petitioner") appeals from the trial court's order affirming the termination of her employment with North Carolina Agricultural & Technical State University (the "University"). On appeal, she argues that the University lacked just cause to discharge her. After careful review, we affirm.
Factual and Procedural Background
The events giving rise to this action began when the University selected a new dean for the University's School of Agricultural and Environmental Sciences (the "SAES") in the summer of 2011. Petitioner was employed by the University as the long-time executive assistant to Dr. Donald McDowell. In 2008, Dr. McDowell was appointed to serve as the Interim Dean of the SAES, a position he held for three years. While he was in that role, he appointed Petitioner to the position of Executive Assistant to the Dean. In this capacity, she reported to him and to the Associate Dean, and she was responsible for providing administrative support to Dr. McDowell. At some point during that period of time, Dr. McDowell gave Petitioner written authorization to sign his name on documents.
In 2011, the University decided to select a permanent dean for the SAES. Dr. McDowell applied for the position but was not chosen. Instead, Dr. William Randle was selected and began serving as Dean in September 2011. Dean Randle was the first Caucasian Dean of the SAES in one hundred years. He was also the first Dean selected from outside the University in over 60 years.
Petitioner was upset about Dean Randle's appointment. Prior to Dean Randle beginning his term as Dean, Petitioner and Gwen Robinson-another assistant in the Dean's office-conducted prayer sessions during which they prayed that Dean Randle would not come to the University and that Dr. McDowell would instead be appointed as Dean. Petitioner was overheard by Star Surgeon, a graduate student working in the office, stating "that she would not do 's[**]t' that Dean Randle asked her to do." She also told Surgeon that "a white man couldn't run the school and you couldn't trust white people."
When Dean Randle began working at the University, Petitioner was generally unhelpful and disrespectful towards him. When he told her he needed to obtain a parking permit, she did not inform him that he had been specifically allocated a parking space as Dean of the SAES. As a result, he parked at the University without a permit for a month. At one point during the semester, Petitioner referred to Dean Randle during a conversation with Surgeon as a "white devil."
Even though Petitioner had helped organize Homecoming activities in past years, Petitioner did not inform Dean Randle of the significance of the SAES Homecoming and worked to prevent him from organizing a successful event. Petitioner cancelled previous orders for a tent and water bottles for the SAES Homecoming event without Dean Randle's knowledge. When she overheard Associate Dean Louis T. Ellis talking about funds for Homecoming events, Petitioner interrupted the conversation, stating loudly that Ellis was "nothing but a house n[****]r" and indicating her displeasure that Ellis was helping Dean Randle plan the Homecoming event.
Although there were a number of incidents involving Petitioner that reflected her hostility toward Dean Randle, three specific incidents triggered the University's decision to dismiss her. First, Petitioner signed a hiring form on behalf of Dean Randle without his prior knowledge or approval and without written authorization. Second, Petitioner refused to comply with Dean Randle's order to provide Ellis with information regarding available funds within the SAES to hire adjunct faculty and subsequently took steps to move department funds for this purpose without Dean Randle's approval. Third, Petitioner took sick leave without prior notification to, or approval from, Dean Randle after he had expressly told her that she needed his approval in order to take leave. Each of these incidents is discussed below.
I. Signing of Hiring Form
When Dean Randle first began working at the SAES, Petitioner and Robinson asked him if they should "continue business as they had in the past." Dean Randle responded that "they should continue as they had been doing until he got a sense of how business was done at NCA&T as he did not want to stop the business function of the SAES." Following this conversation, Petitioner began signing forms on Dean Randle's behalf without expressly informing him that she was doing so.
In early fall of 2011, forms that Petitioner had signed were returned to the Dean's office because Dean Randle had not signed them himself. Petitioner informed Dean Randle that he had to sign those forms himself. Dean Randle later testified that he had not been aware that Petitioner had been signing forms on his behalf.
On 7 December 2011, Sylvia Anderson, the University's Director of Employee Relations and Affirmative Action, sent Dean Randle an email making him aware that a new employee had been approved for hiring as a nutrition specialist in the SAES. When Dean Randle opened the attachment to the email, he learned that on 6 December 2011 Petitioner had signed his name on an EEO Form 102, authorizing the hiring of the new employee. He later testified that he had never given Petitioner permission to sign his name for him on personnel forms and that he had no prior knowledge regarding the new employee. He emailed Anderson and told her that Petitioner did not have authority to sign his name on the hiring form.
II. Request for Budget Information and Transfer of Funds
In early December 2011, Dean Randle contacted Ellis about trying to find funds to hire adjunct faculty for the University's Department of Family and Consumer Science, a department within the SAES. Because Petitioner had worked on position management issues for the SAES and had experience with issues relating to the release of funds, Dean Randle instructed Ellis to contact her to find out if release funds were available to fund the adjunct professor positions.
Upon receiving this instruction, Ellis went to Petitioner's office. He explained the assignment he had been given by Dean Randle and asked her if there were release funds available for the hiring of adjunct professors. He testified that Petitioner's responses to his queries were unhelpful and that he had to go outside of the SAES to obtain assistance.
On 7 December 2011, Ellis told Dean Randle about Petitioner's refusal to provide assistance to him. On the following morning, Dean Randle ordered Petitioner to provide the information Ellis had requested. Later that morning, Petitioner sent Dean Randle the following email: "Dr. Jackai has money that can be used to pay Adjunct Faculty in FCS. They can be paid from position [sic] vacated by Dr. Glass."
That same morning, Dean Randle received an email from Dr. Jackai, the chairperson of the SAES's Department of Natural Resources and Environmental Design. The email stated: "It looks like our funds are about to be used up for someone else. If you approve, I'm fine since I can always come back to you for funds. But I would like to talk with you sometime tomorrow ... morning concerning this." Upon investigating why Dr. Jackai was emailing him regarding these funds, Dean Randle learned that Petitioner had been preparing to transfer funds from the Natural Resources and Environmental Design Department to the Family and Consumer Science Department despite the fact that Dean Randle had not authorized her to take such action.
III. Prior Approval for Sick Leave
On 10 November 2011, Dean Randle had a meeting with Petitioner during which he informed her that she could not take personal leave without his prior approval. Up to that point in time, she had been seeking approval for leave from Dr. McDowell. During this meeting, Dean Randle told her that he -not Dr. McDowell-was her supervisor.
On 14 and 15 December 2011, Petitioner did not report to work. She called the office and informed staff members that she would be out of work because she was sick. She did not speak with Dean Randle personally to either ask his permission to take sick leave or to inform him that she would be absent.
* * * *
When she arrived at work on 13 December 2011, Petitioner received a pre-disciplinary conference notification letter from Dean Randle, which stated, in pertinent part, as follows:
In the early evening of December 7, 2011, I was copied on an email from Sylvia Anderson, releasing a position for our Cooperative Extension Service. To my surprise, I saw you had signed my name releasing the position, a position for which I had no prior knowledge. You were never given permission or approval to sign my name for SAES hires. This is a gross violation related to your position as Executive Assistant. I came to you immediately the morning of December 8thand told you to immediately stop signing my name to approve the release of positions. As far as I know, you have no authority to sign my name for anything.
I also found out December 8, 2011, that you did not provide budgetary information to Mr. Ellis, SAES Associate Dean for Administration, related to the assignment I gave him to determine how we could find laps [sic] or release funds to pay for adjunct faculty in the Department of Family and Consumer Sciences. As a result, you were impeding the progress of a time-sensitive action we need to take. I came to you and asked you to assist Mr. Ellis in any way possible so he could perform the task he was given. When asked to provide budgetary information by senior leadership for which you have access, you are expected to provide that information. This is non-performance for your position. Later that morning, through an email I received from Dr. Jackai, Chair of the Department of Natural Resources and Environmental Design, I learned that you were in the process of moving release funds from his Department to Family and Consumer Sciences, the job I had given to Mr. Ellis. Dr. Jackai wanted to know if I was approving this transfer. Because of events of the day, I was never able to bring this to your attention until now. However, I never gave you the authority to move funds at your discretion, especially without consultation with the Dean or any other senior level administrator with budgetary responsibility in SAES. You are simply not allowed to move funds without consultation and authorization. This is a gross violation of your duties and responsibilities as Executive Assistant.
There is also a series of emails throughout the months of November and December outlining non-performance on your part to which you have already responded[.]
Dean Randle, Anderson, and Petitioner were present at the conference, which was held later on the morning of 13 December 2011. During the conference, Petitioner was provided an opportunity to respond to the issues set out in the notice, and she denied any wrongdoing, stating that she "did not know how to help [Dean Randle]."
By letter dated 15 December 2011, Dean Randle notified Petitioner of her discharge. The letter listed the incidents forming the basis for her dismissal: (1) signing the hiring form on behalf of Dean Randle without permission; (2) failing to provide Ellis with budgetary information for the hiring of adjunct faculty and subsequently attempting to move release funds without authorization; and (3) refusing to request approval from Dean Randle for sick leave.[1]
On 6 January 2012, Petitioner filed an appeal of the dismissal with the University's Division of Human Resources, and her appeal was heard on 25 January 2012 by the State Personnel Act Grievance Panel (the "Grievance Panel"). On 9 February 2012, the Grievance Panel issued a recommendation to the Chancellor of the University, Harold L. Martin, Sr., that Petitioner's discharge be overturned. Chancellor Martin subsequently rejected this recommendation because it did not address whether (1) the grievance was timely filed; (2) relevant evidence had been omitted from the record; (3) the Grievance Panel's findings were supported by evidence of record; and (4) the Grievance Panel "supported each of the resolutions" sought by Petitioner. Upon reconsideration of Petitioner's appeal, the Grievance Panel provided the Chancellor's office with an amended recommendation that Petitioner's dismissal be upheld.
On 12 March 2012, the Chancellor upheld Petitioner's dismissal. On 11 April 2012, Petitioner filed a petition for a contested case hearing in the Office of Administrative Hearings, arguing that the University lacked just cause for her dismissal.
On 8 and 9 August 2013, a hearing was held before Administrative Law Judge ("ALJ") Selina M. Brooks. On 3 January 2014, the ALJ issued a Final Decision affirming Petitioner's dismissal, containing the following pertinent conclusions of law:
6. Respondent demonstrated with credible and substantial evidence that Petitioner's conduct was conduct for which no reasonable person should expect to receive a prior warning, that it willfully violated known or written work rules, and that it constituted insubordination.
....
10. For the reasons stated in the pre-disciplinary conference notice and the discharge letter, [the University] had just cause for discharging Petitioner for unacceptable personal conduct.
On 3 February 2014, Petitioner filed a petition for judicial review of the ALJ's decision in Wake County Superior Court. On 19 June 2015, the Honorable Paul G. Gessner issued an order affirming the ALJ's Final Decision. Petitioner filed a timely notice of appeal to this Court.
Analysis
On appeal, Petitioner argues that the trial court erred by affirming the ALJ's Final Decision. "The North Carolina Administrative Procedure Act (APA), codified at Chapter 150B of the General Statutes, governs trial and appellate court review of administrative agency decisions." Amanini v. N.C. Dep't of Human Resources , 114 N.C. App. 668, 673, 443 S.E.2d 114, 117 (1994). Chapter 150B of the North Carolina General Statutes provides, in pertinent part, as follows:
The court reviewing a final decision may affirm the decision or remand the case for further proceedings. It may also reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional provisions;
(2) In excess of the statutory authority or jurisdiction of the agency or administrative law judge;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Unsupported by substantial evidence admissible under G.S. 150B-29(a), 150B-30, or 150B-31 in view of the entire record as submitted; or
(6) Arbitrary, capricious, or an abuse of discretion.
N.C. Gen. Stat. § 150B-51(b) (2015).
"When this Court reviews appeals from superior court either affirming or reversing the decision of an administrative agency, our scope of review is twofold ...: (1) whether the superior court applied the appropriate standard of review and, if so, (2) whether the superior court properly applied this standard." Mayo v. N.C. State Univ. , 168 N.C. App. 503, 507, 608 S.E.2d 116, 120 (citation omitted), aff'd per curiam , 360 N.C. 52, 619 S.E.2d 502 (2005).
When the issue for review is whether an agency's decision was supported by substantial evidence in view of the entire record, a reviewing court must apply the "whole record" test. A court applying the whole record test may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter de novo . Rather, a court must examine all the record evidence-that which detracts from the agency's findings and conclusions as well as that which tends to support them-to determine whether there is substantial evidence to justify the agency's decision. "Substantial evidence" is defined as "relevant evidence a reasonable mind might accept as adequate to support a conclusion."
Watkins v. N.C. State Bd. of Dental Exam'rs , 358 N.C. 190, 199, 593 S.E.2d 764, 769 (2004) (internal citations omitted).
During the time period relevant to this action, the State Personnel Act ("SPA")[2] provided that "[n]o career State employee ... shall be discharged, suspended, or demoted for disciplinary reasons, except for just cause." N.C. Gen. Stat. § 126-35(a) (2015). "Just cause is a flexible concept, embodying notions of equity and fairness, that can only be determined upon an examination of the facts and circumstances of each individual case." Wetherington v. N.C. Dep't of Pub. Safety , 368 N.C. 583, 591, 780 S.E.2d 543, 547 (2015) (citation and quotation marks omitted).
"There are two bases for the ... dismissal of employees under the statutory standard for 'just cause' as set out in G.S. 126-35." 25 N.C. Admin. Code 1J.0604(b) (2016). First, a career state employee may be dismissed based on "unsatisfactory job performance." N.C. Dep't of Env't & Natural Res. v. Carroll , 358 N.C. 649, 666, 599 S.E.2d 888, 899 (2004). Second, an employee may be dismissed based on "unacceptable personal conduct." Id.
This Court delineated the difference between unacceptable job performance and unacceptable personal conduct and held that termination for engaging in the latter category is appropriate for those actions for which no reasonable person could, or should, expect to receive prior warnings. The State Personnel Manual lists, "careless errors, poor quality work, untimeliness, failure to follow instructions or procedures, or a pattern of regular absences or tardiness" as examples of unsatisfactory job performance. Unacceptable personal conduct includes "insubordination, reporting to work under the influence of drugs or alcohol, and stealing or misusing State property."
Leeks v. Cumberland Cty. Mental Health Developmental Disab. & Sub. Abuse Facil. , 154 N.C. App. 71, 76-77, 571 S.E.2d 684, 688-89 (2002) (internal citations, quotation marks, and emphasis omitted).
"Employees may be dismissed for a current incident of unacceptable personal conduct, without any prior disciplinary action." 25 N.C. Admin. Code 1J.0608(a) (2016) ; see 25 N.C. Admin. Code 1J.0614(7) (2016). "One act of [unacceptable personal conduct] presents 'just cause' for any discipline, up to and including dismissal." Hilliard v. N.C. Dep't of Corr. , 173 N.C. App. 594, 597, 620 S.E.2d 14, 17 (2005) (citations omitted).
In Warren v. N.C. Dep't of Crime Control , 221 N.C. App. 376, 726 S.E.2d 920, disc. rev. denied , 366 N.C. 408, 735 S.E.2d 175 (2012), this Court articulated a three-step test to determine whether just cause exists to discipline an employee who has engaged in unacceptable personal conduct: (1) whether the employee actually engaged in the conduct the employer alleges; (2) whether the employee's conduct falls within one of the categories of unacceptable personal conduct; and (3) whether the misconduct constitutes just cause for the disciplinary action taken. Id. at 379, 726 S.E.2d at 923 (citation omitted).
In the present case, Petitioner argues that the University failed to satisfy any of the prongs of the Warren test. She contends that the University's grounds for termination were (1) not supported by evidence in the record; (2) did not constitute unacceptable personal conduct; and (3) did not amount to just cause for Petitioner's dismissal in light of other factors such as her lengthy work history. For the reasons set out below, we conclude that just cause existed for Petitioner's discharge based on her signing of the hiring form on behalf of Dean Randle without his prior knowledge or authorization.
I. Whether Petitioner Engaged in the Alleged Conduct
The ALJ determined that Petitioner signed a hiring form on Dean Randle's behalf without his prior approval or knowledge and made the following pertinent findings of fact regarding this incident:
29. When Dean Randle first started in September 2011, the Petitioner and Ms. Robinson approached him and asked if they should continue business as they had in the past. He indicated to them that they should continue as they had been doing until he got a sense of how business was done at NCA&T as he did not want to stop the business function of the SAES.
30. On September 8, 2011, the Petitioner started a two-week leave of absence, returning to work on September 26, 2011. On Thursday evenings during her leave, the Petitioner went to the office to process paperwork for researchers and faculty payroll, and signed Dean Randle's name to payroll forms.
....
33. In early fall 2011, forms from around campus were returned with notes indicating that Dean Randle's original signature was needed. The Petitioner and Ms. Robinson informed Dean Randle that documents that they had signed on his behalf were being returned and that they could not sign for him.
34. Thereafter, Dean Randle understood that his signature was necessary on certain documents. He did not sign any forms authorizing the Petitioner or Ms. Robinson to have signatory authority for him.
....
36. When such forms were returned, the Petitioner stated to Star Surgeon, a part-time student worker, that forms were coming back and Dean Randle needs to sign these forms himself.
37. When the Petitioner returned to work, she was informed by Ms. Robinson that she needed written authorization to sign Dean Randle's name for a check request and another time was informed that she needed his authorization to sign his name for travel documents.
38. The Petitioner testified that she knew written authorization was required because she had followed the same procedure to obtain authorization to sign for Dr. McDowell.
....
100. On December 8, 2011, Dean Randle received an email from Sylvia Anderson, NCA&T Director of Employee Relations and Affirmative Action, in which she copied him on a hiring form, EEO Form 102. The attached hiring form authorized the hiring of an individual into a department in SAES. The Petitioner had signed the form on behalf of Dean Randle and noted her initials after his name. (R. Exs. 25 & 26) If the form had proceeded forward through the hiring process, this person would have been hired as an employee of Cooperative Extension without Dean Randle's knowledge or review.
....
107. Dean Randle responded to Ms. Anderson's email of December 8, 2011, and informed her that he was not aware that the Petitioner had signed the form on his behalf. Dean Randle further informed Ms. Anderson that this was the first time this was brought to his attention and that he had never given Petitioner authority to sign his name for such documents.
(Citations omitted.)
Based on our review of the record, we conclude that substantial evidence exists to support the ALJ's findings that Petitioner signed the hiring form on Dean Randle's behalf without his prior knowledge or authorization on 6 December 2011. Therefore, the first prong of the Warren test was satisfied.
II. Whether Petitioner's Actions Constituted Unacceptable Personal Conduct
We must next determine whether Petitioner's action in signing the hiring form rose to the level of unacceptable personal conduct. Because this step of the analysis involves an issue of law, we must apply a de novo standard of review. See Mann Media, Inc. v. Randolph Cty. Planning Bd. , 356 N.C. 1, 13, 565 S.E.2d 9, 17 (2002).
"Unacceptable personal conduct" includes the following:
(a) conduct for which no reasonable person should expect to receive prior warning;
(b) job-related conduct which constitutes a violation of state or federal law;
(c) conviction of a felony or an offense involving moral turpitude that is detrimental to or impacts the employee's service to the State;
(d) the willful violation of known or written work rules;
(e) conduct unbecoming a state employee that is detrimental to state service;
(f) the abuse of client(s), patient(s), student(s) or a person(s) over whom the employee has charge or to whom the employee has a responsibility or an animal owned by the State;
(g) absence from work after all authorized leave credits and benefits have been exhausted; or
(h) falsification of a state application or in other employment documentation.
25 N.C. Admin. Code 1J.0614(8).
This Court has found the existence of "conduct for which no reasonable person should expect a prior warning" in a number of different contexts. See, e.g. , Robinson v. Univ. of N.C. Health Care Sys. , --- N.C. App. ----, ----, 775 S.E.2d 898, 900 (2015) (hospital employee displayed explosive behavior in meetings, disrespected her supervisors, and repeated unsupported claims that employer was discriminating against her); Hilliard , 173 N.C. App. at 596, 620 S.E.2d at 16 (superintendent of correctional center ate food from dining hall, accepted personal services from inmates and employees, and used state equipment to make faxes and long distance telephone calls); N.C. Dep't of Corr. v. Brunson , 152 N.C. App. 430, 431, 567 S.E.2d 416, 418 (2002) (probation officer held in contempt of court for talking during proceeding after magistrate ordered silence despite magistrate later suspending contempt order).
Here, the ALJ determined that "[the University] demonstrated with credible and substantial evidence that Petitioner's conduct was conduct for which no reasonable person should expect to receive a prior warning...." We agree.
The record establishes that at the time she signed the hiring form on 6 December 2011, Petitioner knew that she lacked written authorization to sign documents with Dean Randle's signature. While Dr. McDowell had given Petitioner written authorization to sign on his behalf, Dean Randle never did so. At most, he made an ambiguous statement shortly upon his arrival about doing things "as they had been doing until he got a sense of how business was done at NCA&T." We cannot agree that it was reasonable for her to interpret this broad statement as a license for her to begin signing his name for him without express authorization from him allowing her to do so. Before signing any documents on his behalf, it was incumbent upon her to clearly and unambiguously obtain such authorization directly from him.
Moreover, as noted above, the ALJ determined that as of early fall 2011, it was expressly brought to Dean Randle's attention that forms signed by others on his behalf were being returned. Petitioner was made aware of this as well. From that point on, it should have been abundantly clear to her that she was not authorized to sign for Dean Randle without his specific written authorization, which he never gave her.
Furthermore, while the ALJ did not find that Petitioner had authority to sign any document for Dean Randle in December of 2011, we note that the incident giving rise to her discharge did not concern her signing for him on a garden-variety office form. To the contrary, it involved her incorrectly representing to others in the University-by means of her signing for Dean Randle-that he had approved the hiring of a new employee for the SAES, which was utterly false.
Petitioner argues that the ALJ should have accepted her own testimony on this issue. However, the ALJ made the following findings regarding the credibility of the witnesses:
121. Based upon the Undersigned's observation of the demeanor of the witnesses as well as consideration of the testimony and all other admissible evidence, the Undersigned finds the testimony of Dean Randle, Associate Dean Ellis, Sylvia Anderson and Star Surgeon to be credible.
122. The Undersigned finds as fact that the testimony of the Petitioner, Dr. McDowell and Gwen Robinson does not negate a finding that the Petitioner engaged in unacceptable personal conduct.
We construe these findings-when read together-as a determination that the ALJ simply did not find Petitioner's testimony credible. City of Rockingham v. N.C. Dep't of Env't & Natural Res. , 224 N.C. App. 228, 239, 736 S.E.2d 764, 771 (2012) ("The credibility of witnesses and the probative value of particular testimony are for the administrative body to determine, and it may accept or reject in whole or part the testimony of any witness." (citation and quotation marks omitted)).
In sum, because taking the extraordinary step of signing a hiring form for her supervisor without prior authorization constitutes the sort of unacceptable conduct for which no prior warning is necessary, the ALJ did not err in determining that Petitioner's actions constituted unacceptable personal conduct.
III. Whether Petitioner's Conduct Constituted Just Cause for Her Dismissal
"Unacceptable personal conduct does not necessarily establish just cause for all types of discipline." Warren , 221 N.C. App. at 383, 726 S.E.2d at 925. Thus, the final prong of the Warren test requires us to "balance the equities" by "examin[ing] the facts and circumstances of [the] case" in order to determine whether the "conduct constitutes just cause for the disciplinary action taken." Id. at 379, 383, 726 S.E.2d at 923, 925.
While the ALJ recognized that Petitioner had worked as an employee for the University for 37 years, it also made findings showing that Petitioner had displayed a consistent pattern of hostility toward Dean Randle and repeatedly attempted to undermine his ability to succeed in his position as Dean of the SAES. Specifically, the ALJ found that: (1) before Dean Randle even began work, Petitioner openly prayed with other employees that he would not actually come to the University; (2) she was overheard declaring "that she would not do 's[**]t' that Dean Randle asked her to do"; (3) Petitioner stated to Surgeon that because Petitioner was "SPA" Dean Randle could not fire her; (4) Petitioner did not notify Dean Randle that he had been specifically allocated a parking space as Dean of the SAES; (5) she referred to Dean Randle as the "white devil"; (6) she not only failed to inform him of the significance of the SAES Homecoming but actually cancelled a tent and water bottles that had been ordered by the department for the event; (7) Petitioner told Ellis that he was "nothing but a house 'n[****]r' " for helping Dean Randle plan for the SAES Homecoming event; (8) Petitioner repeatedly failed to print materials for Dean Randle so that he would be prepared for meetings; and (9) although Dean Randle repeatedly asked her for a list of current personnel at the SAES, she never provided that list to him.
Thus, we conclude that substantial evidence existed to support the ALJ's conclusion that Petitioner demonstrated unacceptable personal conduct. Moreover, after a balancing of the equities, we are satisfied that just cause existed for Petitioner's discharge.[3] See Granger v. Univ. of N.C. at Chapel Hill , 197 N.C. App. 699, 707, 678 S.E.2d 715, 720 (2009) ("We hold Petitioner's unacceptable personal conduct provided Respondent just cause to terminate Petitioner's employment without any prior warning or lesser punishment.").[4]
Conclusion
For the reasons stated above, we affirm.
AFFIRMED.
Report per Rule 30(e).
Judges ELMORE and DIETZ.

This third ground was based on Petitioner's failure to show up for work on 14 and 15 December 2011 without prior approval from Dean Randle-conduct that occurred subsequent to her pre-disciplinary conference notice.

The State Personnel Act has since been amended and retitled as the North Carolina Human Resources Act. However, the amendments are not relevant to the present appeal.

Because we hold that Petitioner's discharge was lawful due to her unauthorized signing of the hiring form, we need not address the other stated grounds for her dismissal. See Hilliard., 173 N.C. App. at 597, 620 S.E.2d at 17 ("One act of [unacceptable personal conduct] presents just cause for any discipline, up to and including dismissal." (citations and quotation marks omitted)).

Petitioner argues that her due process rights were violated by her dismissal because her pre-disciplinary conference notification letter did not list her refusal to seek prior approval before taking sick leave as a ground for her discharge. Because we are not upholding her discharge based on her unauthorized taking of sick leave, however, this argument is moot. Moreover, to the extent Petitioner is claiming that her due process rights were violated in other respects in connection with these proceedings, our careful review of the record has failed to disclose any valid basis for this assertion. Finally, we note that "[d]ismissals for unacceptable personal conduct only require (1) a pre-dismissal conference between the employee and the person recommending dismissal, and (2) written notification of the specific reasons for the dismissal and the employee's right to appeal." Kea v. Dep't of Health and Human Servs., 153 N.C. App. 595, 603-04, 570 S.E.2d 919, 925 (2002), aff'd per curiam, 357 N.C. 654, 588 S.E.2d 467 (2003).